[No. S005169. Crim. No. CR26427. Nov. 19, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL HILL, Defendant and Appellant.

---

COUNSEL

Sonnenschein, Nath & Rosenthal, Miller, Starr & Regalia and Michael J. Hassen for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

BAXTER, J.—Defendant Michael Hill was convicted of two first degree murders (Pen. Code, § 187) and one count of robbery (Pen. Code, § 211) with the personal use of a firearm. The jury found to be true the special circumstances that the murders were committed during a robbery (Pen. Code, § 190.2, subd. (a)(17)(i)) and that defendant was guilty of multiple murders (Pen. Code, § 190.2, subd. (a)(3)). The jury returned a verdict of death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment in its entirety.

### GUILT PHASE FACTS

I. *The police investigation*

On August 15, 1985, the bodies of Anthony Brice, Sr. (Brice), and his four-year-old son, Anthony Brice, Jr. (Anthony), were found by police on the floor of the jewelry store operated by Brice in Oakland, California. Each victim had been shot in the head at close range with a .38-caliber gun. The appearance of the crime scene suggested there had been a robbery. Within a week after the killings, the Alameda County Board of Supervisors offered a $5,000 reward for information resulting in the arrest and conviction of the killer(s).

Oakland Police Department Sergeant Gerald Medsker was the primary investigator assigned to the Brice killings. He first learned on August 22,

1985, of defendant's possible involvement. The following day, Sergeant Medsker contacted Robert Fox, a jewelry salesman, who had been in Brice's store the day of the killings. Based on a photographic lineup, Fox identified defendant as having been in the store while Fox was there.

On September 10, 1985, after further investigation, Sergeant Medsker obtained from the Alameda County Superior Court an order allowing police to transport defendant from the county jail in Santa Rita to police department headquarters for questioning. (Defendant was in jail for having violated the terms of his probation for a prior conviction unrelated to the Brice killings. He had not been in jail when the Brices were killed.) On September 11, 1985, defendant was taken to headquarters and was informed that the police were investigating the Brice killings. Defendant signed a written waiver of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and provided police with three statements recorded on audiotape. He incriminated his acquaintance Michael McCray, an illegal drugs dealer.

The police arrested McCray on the evening of September 11. He consented to a search of his automobile, and police found a pouch of jewelry, which McCray told them he had won in a poker game. With McCray's consent, police also searched the room where he was residing. They found twenty-eight assorted gold chains in an envelope, two shotguns, three baseball bats, an assortment of shotgun, rifle, and pistol ammunition, empty .38- and .44-caliber shells, and narcotics paraphernalia. When interrogated by the police, McCray incriminated defendant by asserting as follows: Defendant had owed McCray $600 for cocaine. On the day of the Brice killings, McCray loaned defendant a .38-caliber handgun and ammunition. McCray provided defendant with the gun because defendant had said he intended to use it in a robbery. Defendant returned to McCray's house the afternoon of the killings with a brown paper bag containing at least three dozen gold chains and one dozen watches. Defendant also had about $300 in cash, which he claimed to have taken from a jewelry store. He gave McCray $150 in cash and jewelry worth about $450.

## II. *The criminal charges*

After further investigation, defendant was charged by information on May 19, 1986, with two counts of murder (Pen. Code, § 187), one count of robbery (Pen. Code, § 211), two statutory special circumstances—multiple murder (Pen. Code, § 190.2, subd. (a)(3)) and murder committed during a robbery (Pen. Code, § 190.2, subd. (a)(17)(i))—use of a firearm (Pen. Code, §§ 1203.06 and 12022.5), and infliction of great bodily injury (Pen. Code,

§§ 1203.075 and 12022.7). The information also alleged that defendant had previously been convicted of the possession of narcotics for sale.

Defendant pleaded not guilty and denied the special circumstances and other allegations. He subsequently amended his plea to admit the allegation of a prior criminal conviction. The prosecution amended the information by striking the allegations of great bodily injury.

III. *The trial*

A. *The prosecution's case*

The prosecution's theory of the case was that defendant robbed and killed the Brices because defendant was under pressure to repay a drug debt to Michael McCray. The prosecution also contended McCray was defendant's accomplice as a result of having loaned the gun to defendant with knowledge that defendant intended to use it to commit a robbery. Several persons testified regarding defendant's actions and statements during the period shortly before and after the Brice killings.

Derek Agnew testified that he knew Brice and had entrusted him with cash to keep in the store's safe. On August 13, two days before the killings, Agnew went to the store and gave Brice an additional $150 for safekeeping. Defendant was in the store at that time. Agnew already had about $550 being kept in the store's safe. He testified that, "As I started counting my money I like say, you know, he [defendant] was in my business."

Robert Fox, the costume jewelry salesman who had previously identified defendant to police (see p. 972, *ante*), testified that he (Fox) had been in Brice's store on about 10 occasions before the killings. Fox purchased costume jewelry from Brice, who engraved it with the false notation, "14k." Fox sold the fake jewelry, known as "slum," for about double the amount he had paid Brice for it. Fox was in Brice's store about noon on the day of the killings. Fox noticed that Brice had a large amount of currency in his pocket. While Fox was in the store, defendant knocked on the door and was allowed to enter. Fox did not see a gun on defendant. When Fox left about 15 minutes later, the only persons in the store were defendant and the Brices.

Denine Houston testified that in August 1985 she was living in a house on 23d Avenue in Oakland (the group house) with her boyfriend and several other persons including defendant. On the morning of August 13, 1985, defendant was in her room watching television. She heard defendant tell her boyfriend that defendant "had a lick up at a slum shop." "Lick up" meant a

robbery. "Slum shop" meant a fake jewelry store. According to Houston, defendant said that "It was a slum shop on Foothill off of 38th and he can get in because he know the people real good, and he had to have some money 'cause he was tired of being broke." (Brice's jewelry store was located at 38th and Foothill in Oakland.) Houston's boyfriend, Sam Dartez, also testified that a day or two before the killings, defendant said that "He got a lick up and he's going to have some money."

Houston further testified that, on the morning of August 15, defendant "was talking about going to get his piece [gun], going to take care of his business." Defendant returned about an hour or two later with a gun that Houston identified as being similar to People's exhibit No. 4-A, a .38-caliber Smith & Wesson revolver. Defendant told Houston he was tired of being broke. Defendant left and returned about three or four hours later with a brown paper bag (approximately five or six inches square and fifteen to eighteen inches high) containing "a bunch of slum jewelry," "pockets full of money," and an "eight ball [one-eighth ounce] of cocaine."

Three other witnesses testified similarly. Annie Mae Smith, who also lived in the group house, testified that on August 15 she saw defendant at the house. "He had a bag of jewelry, some money and a gun." The gun was substantially similar to the .38-caliber Smith & Wesson introduced into evidence as People's exhibit No. 4-A. Defendant said, "This is the way to get yours."

Rudolph Wilkins, another resident of the group house, is defendant's cousin. He testified that on the morning of August 15, defendant came into Wilkins's bedroom, showed him a .38-caliber revolver similar to People's exhibit No. 4-A, and asked for some .38-caliber bullets. Wilkins had no bullets. Defendant left and returned midafternoon with a brown paper bag full of gold-colored necklaces. He also had a "wad of money" in his pocket and repaid Wilkins $30. Defendant said that "he had knocked over a jewelry store and he had snuffed somebody."

Marta Daniels, who had lived with Michael McCray for several years and was his "common law" sister-in-law, testified that on the morning of the killings she asked defendant to give her a dollar and that he told her he had no money but would have one "when he got through with his lick." To Daniels, a "lick" meant a "robbery," a "scam," a "con," or "any kind of thing where you get something for doing something wrong." Later that same day, defendant gave Daniels $50 to buy some cocaine. He had a "fan of money" that Daniels estimated to be "about 600 dollars." He said "that he had to have his and he was going to get it and this is what he got." Three days later, she observed defendant on a street corner selling jewelry and watches.

Sam Dartez moved into the group house about two to three weeks before the killings. Dartez had known defendant for three to four years and sold slum jewelry with him. On the afternoon of August 15, Dartez was leaving the house (to appear in court on a charge of possessing cocaine) when he saw defendant coming down 23d Street toward the house. Defendant had a "big grocery bag" containing "slum jewelry, watches, chains, a whole bunch of chains." Dartez had never before seen defendant with so much jewelry. Defendant told Dartez, "Man, we got work to do," meaning to Dartez that they needed to sell the jewelry. Defendant gave Dartez $20 to buy cocaine. He bought some, brought it to the group house, and consumed it with defendant. Dartez then left for his court appearance. He returned later than afternoon. Someone brought cocaine to the house, and defendant paid for the drug. He had "a lot of money . . . a wad."

Wilbert Winchester testified that he had known defendant for many years and that, shortly after the Brice killings, perhaps a day or two, maybe a week, afterwards, defendant approached him on an Oakland street and asked if he wanted to buy a .38-caliber pistol. Winchester did not see a gun. He declined the offer because he did not want a pistol and because he was on parole.

Ranee Bennett, a methadone addict, testified that she first met defendant on August 19, 1985, while she was "hanging out" at a taco restaurant in Pittsburg, California. "He said he was trying to down [sell] some pills and a gun." She could see the gun tucked into his waistband, and he said it was a .38-caliber. It resembled the gun introduced as People's exhibit No. 4-A. Defendant left but returned later that day to the restaurant. He told Bennett he had no place to stay, and she offered to let him stay at her residence. They drove to her home. He no longer had the .38-caliber gun. On or about August 30, she told him she had been hearing things and asked him about a robbery and murder. "He said he had did it but—and I asked him why did he shoot the kid and he said because they knew him. . . . He said it was a jewelry store. . . . It was in Oakland. . . . It was a man and his son. . . . [Defendant] Said it was a robbery. . . . The robbery was supposed to have been done with a .38. . . . I was just stunned. I just kept asking why. Q: And what did he say? A: He said 'cause they knew him." Bennett told defendant that he should surrender himself to the police.

The prosecution also introduced testimony by two jailhouse informants. Arthur Allen was incarcerated in September 1985 at the Santa Rita jail for receiving stolen goods and was defendant's cellmate. Allen testified: "He [defendant] said he shot two people and robbed a jewelry store. Q: Did he say why he had shot the two people? A: He shot the one—the older man because I guess he thought he was going for a gun or some kind of weapon,

but he just shot the boy because [the] boy could have recognized him." On cross-examination, Allen asserted that defendant had said "there was blood all over the counter" at the jewelry store. (A police officer testified that no blood was found on the counter.) Allen was released from custody earlier than normal after informing his jailers of defendant's admission.

Clifford Turner met defendant in May or June 1985, at which time defendant offered to sell Turner a gun. Turner was arrested in August 1985 and incarcerated at Santa Rita in Greystone, a building for high risk inmates including informers. When defendant arrived at Santa Rita, he was placed in the cell next to Turner's. Defendant admitted that he had robbed Brice and killed Anthony because "the little boy knew him as Uncle Mike." In December 1985, Turner pleaded guilty to three counts of robbery, two counts of assault with a deadly weapon and a petty theft with a prior conviction. While awaiting his sentencing, Turner wrote a letter to the district attorney, offering to "help the state . . . if the state is willing to help me, and if not I'm still willing to help the District Attorney's office." At the time, Turner was "very angry" at defendant.

Oakland Police Department Sergeant Medsker testified regarding his investigation, including the circumstances of his interrogation of defendant on September 11, 1985. (Those facts and the substance of defendant's statements are set forth in detail below, in connection with defendant's claim that his statements were involuntary. [See pp. 979-981, *post.*]) Portions of defendant's three tape-recorded statements were introduced into evidence and played for the jury.

Sergeant Medsker's investigative partner, Sergeant Jerry Harris, testified that Michael McCray was arrested on September 11, 1985, on the basis of the statements made earlier that day by defendant. McCray then made a series of taped statements. Sergeant Harris testified as to portions of those statements. McCray told Sergeant Harris that defendant owed McCray $600 for cocaine and that defendant came to McCray's house early in the afternoon of August 15 with a brown paper bag containing 36 or more gold chains and 12 watches. Defendant also counted out about $250 to $300, which he said he had taken from a jewelry store. Defendant gave about two dozen chains and six watches and $150 to McCray in payment of the drug debt. Defendant also had a .38-caliber Smith & Wesson pistol, which he removed from his waistband and unloaded. McCray was "pretty sure" there were three empty shells taken from the gun. McCray had given the gun earlier that day to defendant with five rounds of ammunition in it because defendant had "said that he was going to pull a robbery."

Dr. Thomas Rogers, a pathologist, testified that the cause of death of Brice and his son Anthony was gunshot wounds to their heads. Dr. Rogers

extracted two slugs from Brice's head and one from Anthony's head. Chester Young, a police department criminalist, testified that all three slugs had been fired from a .38-caliber gun. The gun introduced as People's exhibit No. 4-A was one of four brands of .38-caliber handguns that could have fired the slugs.

### B. *The defense*

The defense was that Michael McCray had killed the Brices and was attempting to exculpate himself by incriminating defendant. Defendant testified on his own behalf. He contended several of the prosecution witnesses were either lying or mistaken as to his alleged statements and actions. He had known Brice about 12 years and was a friend of both Brice and his son Anthony. Defendant went to their store the morning of August 15 to get some slum jewelry and to attempt to sell some videocassette recorders (VCR's). He knocked on the door and was let into the shop by Robert Fox. Brice and Anthony were in the store. Fox then left and Brice asked defendant to buy some cigarettes. He used the door keys to let himself out of the store and went to get the cigarettes. As he was walking down the street to a grocery, he saw McCray in a car parked across the intersection from Brice's store. As defendant was returning from the grocery, McCray called out to him, and he approached McCray. McCray asked who was in the jewelry store and whether Brice had any money. Defendant told McCray both Brices were there, and defendant returned to the store, using the keys to reenter. He told Brice about the conversation he had just had with McCray.

About 10 minutes later, there was a knock at the door. Defendant looked out a window, saw McCray, and told Brice that McCray was at the door. Brice threw the keys to defendant and told him to open the door. McCray entered and pulled out a gun, went behind Brice, and fired the gun. Defendant ducked and fled the store. He heard a second shot while fleeing.

Defendant paid a passing motorist to drive him away from the scene. A few blocks away, he got out, and as he was walking down the street, he saw Alonzo Hill, a friend to whom he had sold VCR's. At this time, Alonzo Hill paid defendant $650 for the VCR's. As this was happening, McCray drove up in his car. McCray gave defendant a grocery bag of slum jewelry like that he had seen in Brice's store. Defendant did not want the jewelry because he knew it was stolen, but he took it anyway.

Defendant began walking toward the group house where he was residing. On the way there, he came across Sam Dartez. Defendant asked him to help sell the slum jewelry. Dartez declined. Defendant gave him $20 to buy

cocaine. They went to the group house and smoked the cocaine. Dartez then left for a court appearance, and defendant remained at the house. Later that afternoon, more cocaine was delivered to the house. Defendant paid $150 for the drug. About 4:30 p.m. Marta Daniels came to the house. Defendant gave her the grocery bag and about one-half of the jewelry he had obtained earlier that day from McCray.

Several prosecution witnesses testified on cross-examination that later on the evening of August 15 McCray came to the group house several times looking for defendant. McCray said he "wanted his shit."

Defendant testified on cross-examination that several statements he made to police during his interrogation on September 10 were false and that he had initially concealed McCray's alleged involvement because defendant was afraid of McCray.

## GUILT PHASE ISSUES

### I. *Admissibility of defendant's statements to the police*

The trial court denied defendant's motion under Penal Code section 1538.5 and Evidence Code section 402 to suppress his statements to the police. Defendant contends the statements were the result of an illegal arrest or detention and were involuntary. We reject both contentions.

#### A. *Alleged illegal arrest or detention*

Defendant was in the Santa Rita jail when police needed to interrogate him. Sergeant Medsker preferred to conduct the questioning at police headquarters because he had more information about the case there and thought it might be necessary to conduct a polygraph examination of defendant. On September 10, Sergeant Medsker obtained a removal order from the Alameda County Superior Court that directed defendant's transfer from Santa Rita to police headquarters. Defendant was transported the next day and was interrogated at headquarters.

Defendant contends his transfer from Santa Rita was equivalent to an arrest without probable cause. (Sergeant Medsker testified at the suppression hearing that, as of September 10, he did not believe he had sufficient evidence to arrest defendant.) Defendant does not contend the interrogation would have constituted an arrest or detention if it had been conducted at the Santa Rita jail. Defendant cites no authority, and we are aware of none, for his conclusion that his transfer from one facility to another was an arrest or detention that required probable cause.

Defendant relies on *People* v. *Boyer* (1989) 48 Cal.3d 247, 267-268 [256 Cal.Rptr. 96, 768 P.2d 610], for the proposition that he was under arrest at the time of the transfer because a reasonable person in his position would not have felt free to leave. *Boyer* is inapposite. Of course, defendant was not free to leave. He was already properly in custody for an unrelated offense. That is why his argument must fail. The transfer from one jail to another did not effect a seizure of defendant for the obvious reason that he was already lawfully in custody. Likewise, "An arrest is taking a person into custody, in a case and in the manner authorized by law." (Pen. Code, § 834.) Because defendant already was lawfully in custody, he was not taken "into custody" when he was transferred, and the transfer was not an arrest.

### B. *Whether defendant's statements were voluntary*

During his interrogation on September 11, 1985, defendant gave three tape-recorded statements to the police. In his motion *in limine* to suppress them, he contended the third statement, and perhaps the second as well, was involuntary because the interrogation was unduly long and coercive. On appeal he challenges only the third statement—in which he admitted, contrary to his prior statements, that he was present at the time of the robbery and killings. ▇ Our task is to examine the facts and determine independently whether the prosecution met its burden of proving by a preponderance of the evidence that defendant's statements were voluntary. (*People* v. *Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) Defendant's contention of involuntariness is not supported by the record.

Defendant arrived at police headquarters at 9:22 a.m. and was placed in an interview room. He was left alone for about three minutes and at his request was then taken to the restroom. He was returned to the interview room. Sergeant Medsker identified himself and explained that he was investigating the Brice killings. Sergeant Jerry Harris was also present. Defendant was orally advised of his rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436 (*Miranda*), and he signed a written acknowledgment that he had been so advised. He also indicated in writing that he nevertheless wished to speak with the police.

Defendant was interrogated for about 50 minutes, during which time Sergeant Medsker took written notes. At 10:35 a.m. Sergeant Medsker began an audio recording of defendant's statement. Defendant asserted that he first learned of the Brice killings while watching the television evening news on August 15. The taping session lasted 27 minutes—until 11:02 a.m. Defendant was then left alone for a few minutes, taken to the restroom, and returned

to the interview room. Sergeant Medsker asked defendant whether he wished to eat, defendant said, "Yes," and Sergeant Medsker brought him food at 11:35 a.m. He was not questioned while he ate.

At 12:04 p.m., Sergeant Medsker asked defendant if he was willing to take a polygraph examination. Defendant agreed. The examiner readvised defendant of his *Miranda* rights, and defendant signed an acknowledgment of the advisement. The polygraph examination then began and continued until shortly before 1:22 p.m. when defendant was returned to the initial interview room. In the presence of defendant and Sergeants Medsker and Harris, the polygraph examiner explained that defendant had not "passed" the examination.

At 1:58 p.m. Sergeant Medsker resumed questioning defendant and continued until 3:13 p.m., a period of one hour and fifteen minutes. This session was not tape-recorded. Sergeant Medsker left the room. Four minutes later, defendant knocked on the door, Sergeant Medsker responded, and they spoke briefly. Sergeant Medsker again left the room and did not return until 3:52 p.m.

When he returned, Sergeant Medsker showed defendant two photographs, left the room, and returned at 4:18 p.m. Three minutes later, he began a second taping session with defendant. Defendant was not given a third set of *Miranda* warnings before this session. He asserted that he knew the identity of the person who killed the Brices and that his first story to police was false because he did not want to "snitch" on the killer, "so that I [defendant] don't get killed next." The second recording session lasted until 5:15 p.m., about 54 minutes.

Sergeant Medsker left defendant alone in the interview room and returned about 15 minutes later to take him to the restroom. On the walk back to the interview room, defendant stated that he thought the killer's surname was "McCray." Sergeant Medsker returned defendant to the interview room and left to obtain a photograph of McCray. At 5:48 p.m., Sergeant Medsker came back with a "hot print" photograph of McCray. Defendant identified the photograph subject as being the person responsible for the Brice killings.

At 6:50 p.m. defendant was given a sandwich. Questioning resumed at 7:10 p.m. and continued until 10:05 p.m. Defendant was not readvised of his *Miranda* rights. Sergeant Medsker tape-recorded the latter portion of this session—from 9:16 p.m. to 10:05 p.m. In this third recorded statement, defendant admitted for the first time that he was present in Brice's jewelry store at the time of the robbery and killings. After this interrogation session, defendant was returned to jail.

The next morning, after police had arrested and questioned Michael McCray, Sergeant Medsker sought again to interrogate defendant. For the first time, defendant invoked his *Miranda* rights.

Defendant does not dispute the foregoing chronology of his interrogation. He contends, rather, that approximately eight hours of actual interrogation (in five separate sessions) over a twelve-hour period was unduly lengthy and thus coercive, rendering involuntary his third recorded statement. Defendant cites no authority for the proposition that such a length of time is, in and of itself, unfairly coercive. The voluntariness of a confession must be tested by "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041]; *People* v. *Thompson, supra,* 50 Cal.3d 134, 166; 1 LaFave, Criminal Procedure (1984) § 6.2(c), p. 444.) Defendant points to no circumstance other than the length of his interrogation.

We are aware of no authority that would support a specific time limit on interrogation that would apply to all cases, regardless of their facts. Drawing such a bright line for all cases would be contrary to the "totality of the circumstances" test. Of course, custodial interrogation might continue for so long as to become unduly coercive under the circumstances of a particular case. (*Ashcraft* v. *Tennessee* (1944) 322 U.S. 143, 153 [88 L.Ed. 1192, 1199, 64 S.Ct. 921] [suspect interrogated for 36 hours without sleep or rest by relay teams of police officers and lawyers].) This, however, is not such a case. The 12-hour period on September 11 was not one of continuous interrogation. The actual interrogation, which was divided into five sessions, comprised only about eight hours. The breaks between sessions were not of insignificant duration. Nor was the period of interrogation unduly lengthy under the circumstances. It took place during normal waking hours—from approximately 9:30 a.m. until 10 p.m. Defendant was promptly provided with food, beverages, and restroom breaks whenever he requested them. (He was fed shortly before the final session to which he now objects.) The final session lasted only three hours. The record does not reflect that defendant was unduly distressed or subjected to any abusive or improper interrogation techniques.

Most important, defendant never once requested any break in the interrogation or asked that it be terminated. This weighs heavily against his claim of excessively long questioning. He was twice given *Miranda* warnings, which he acknowledged both times in writing. The record reflects that he was fully aware he could terminate the interrogation at any time. For example, the next morning, September 12, when Sergeant Medsker attempted to resume questioning, defendant invoked his *Miranda* rights. Interrogation ceased immediately.

Neither the length nor circumstances of defendant's interrogation indicate that any of defendant's statements, including the third and final statement, was involuntary. The trial court did not err in denying defendant's motion to suppress.

## II. *Alleged ineffectual waiver of Miranda rights*

■ Defendant contends his September 11 waiver of his rights under *Miranda, supra,* 384 U.S. 436, was ineffectual because he was not specifically informed of the possibility he could receive the death penalty if found guilty of the Brice killings. We reject the contention for two reasons.

Defendant failed to raise the ineffective-waiver argument in support of his motion under *Miranda, supra,* 384 U.S. 436. The argument is therefore waived. (Evid. Code, § 353, subd. (a).)

We also reject the contention on the merits. Under *Miranda, supra,* 384 U.S. 436, a custodial suspect must be warned prior to interrogation "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Id.,* at p. 444 [16 L.Ed.2d at pp. 706-707].) Defendant acknowledges no court has adopted his view that the *Miranda* warning should be expanded to include possible punishment. In *Colorado* v. *Spring* (1987) 479 U.S. 564 [93 L.Ed.2d 954, 107 S.Ct. 851], the court rejected the defendant's contention that his *Miranda* waiver was invalid because he had not been advised of all crimes about which he might be questioned. "The Constitution does not require that a criminal suspect know and understand *every possible consequence of a waiver* of the Fifth Amendment privilege. . . . [¶] . . . [¶] . . . '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' [Citation.] Here, the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature. . . . [¶] This Court's holding in *Miranda* specifically required that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him. There is no qualification of this broad and explicit warning." (*Id.,* at pp. 574 and 576-577 [93 L.Ed.2d at pp. 966-968], brackets and italics in original, fn. omitted.) If a suspect need not be informed of the possible charges against him, there is no basis for concluding that he must be advised of the possible punishment for those charges if proven. Defendant's *Miranda* waiver was constitutionally sufficient.

### III. *Trial court's jurisdiction over Juror Magann*

Defendant contends the Alameda County Superior Court was without jurisdiction to try this case because one of the jurors, Marie Magann, resided in Santa Clara County at the time of trial and was therefore not within the trial court's jurisdiction. We reject the contention.

During the examination of prospective jurors, Magann informed the court and counsel that she (Magann) was then residing in the town of Morgan Hill in Santa Clara County. This was undisputed. Magann apparently had received a summons for jury duty because she had previously resided in Alameda County, but she had not notified the Department of Motor Vehicles (DMV) of her change of address. Magann, however, had crossed off her former Alameda County address on her driver's license and had written her Morgan Hill address on the back of the license.

The following colloquy then ensued in chambers between the court, Magann, and counsel: "Court: As far as not having changed it [with the DMV], you certainly might have said something to the office a long time ago, but at this point it's too late to excuse you. Magann: I didn't want to get into any trouble. Court: As long as we know? Magann: Okay. [Magann then left the chambers conference.] Court: It's my understanding for the record neither side wanted to issue any challenge for cause or give her an excuse; is that right? Prosecutor: That's right. Defense counsel: *That is correct, your honor.*" (Italics added.)

Code of Civil Procedure section 203, subdivision (a)(4) includes within the categories of *in*eligible jurors, "[p]ersons who are not residents of the jurisdiction wherein they are summoned to serve." Respondent contends there was no error under section 203 in allowing Magann to serve as a juror because the evidence was in conflict as to Magann's residence. This assertion is belied by the record. Magann unequivocally stated that she was residing in Santa Clara County at the time of trial and that she had changed her address accordingly on her driver's license. The fact that she had not timely notified the DMV of her address change did not render her a resident of Alameda County, and neither the trial court nor counsel for either party made any such assertion.

Respondent also asserts no error because the county residency requirement in Code of Civil Procedure section 203, subdivision (a)(4) was not enacted until 1988—*after* defendant's trial in 1987. (Stats. 1988, ch. 1245, § 2, p. 4144.) Defendant responds that section 203 codified existing law and thus applied to his trial, but he does not identify the "existing law" to which

he is referring. If he means statutory law, he is incorrect. Code of Civil Procedure former section 198, the statutory predecessor to current section 203, provided that a competent juror ". . . shall have been a resident of the state *and of the county* or city and county for one year immediately before being selected and returned . . . ." (Stats. 1971, ch. 1748, § 29, p. 3748, italics added.) In 1975, however, the Legislature amended section 198 by deleting the county residency requirement. (Stats. 1975, ch. 172, § 1, p. 317.) Both the language and the history of the 1975 amendment to Code of Civil Procedure section 198 make clear the Legislature intended to delete the county residency requirement. The amendment was presented in Assembly Bill No. 501 as follows: "A person is competent to act as a juror if he be: 1. A citizen of the United States of the age of 18 years who ~~shall have been a resident of the state and of the county or city and county for one year immediately before being selected and returned~~ *meets the residency requirements of electors of this state . . . .*" (Assem. Bill No. 501 (1975-1976 Reg. Sess.) § 1, language with strike marks deleted, language in italics added.) The Legislative Counsel's Digest explained, "Existing law requires a prospective juror to be a resident of the state and of the county or city and county for one year immediately before being selected and returned. [¶] This bill repeals that provision, and with respect to residency, provides that a person is competent to act as a juror if he meets the residency requirements of electors of this state." (Legis. Counsel's Dig., Assem. Bill No. 501, 2 Stats. 1975 (Reg. Sess.) Summary Dig., p. 45.)

The present requirement that a juror must be a resident of the jurisdiction did not reappear until 1988. (Stats. 1988, ch. 1245, § 2, p. 4144.) The 1988 amendment was not a codification of existing statutory law because, at the time of defendant's trial, there was no statutory requirement that a trial juror reside in the county of trial. Because Code of Civil Procedure section 203, subdivision (a)(4) was not enacted until after defendant's trial, we, of course, do not apply or construe that statute in this case except to the extent we have noted that it does not reflect any statutory juror residency requirement existing at the time of defendant's trial.

The statutory law at the time of trial, however, is not dispositive of defendant's claim of error. ■ Although he does not frame his challenge to Juror Magann in constitutional terms, "The common law vicinage right to trial by jury selected from the vicinage or county is implied in the state Constitution." (*Hernandez* v. *Municipal Court* (1989) 49 Cal.3d 713, 721 [263 Cal.Rptr. 513, 781 P.2d 547] (*Hernandez*), citing *People* v. *Powell* (1891) 87 Cal. 348, 354-360 [25 P. 481].) In *Hernandez, supra,* 49 Cal.3d 713, we also considered the vicinage right under the Sixth Amendment to the federal Constitution and held that, "[i]n California the boundaries of the

vicinage are coterminous with the boundaries *of the county.*" (*Id.*, at p. 729, italics added.) ▆▆ Defendant had a federal and state constitutional right to a trial by jurors who resided in the county where the trial was held.

Defendant, however, waived his vicinage right. The trial court specifically asked defendant's counsel whether he wished to challenge Magann, and counsel declined. Moreover, he did so after having extensively questioned Magann on voir dire. We have made clear that a defendant's counsel, even over the explicit objection of his client, may properly waive the vicinage right. (*People* v. *Guzman* (1988) 45 Cal.3d 915, 937 [248 Cal.Rptr. 467, 755 P.2d 917].)

We also have long held that a defendant's objection to a juror's competency, first made after trial, is belated and not cognizable on appeal. (*People* v. *Evans* (1899) 124 Cal. 206, 210 [56 P. 1024]; *People* v. *McFarlane* (1903) 138 Cal. 481, 490 [71 P. 568].) Defendant contends he is not subject to this rule because in prior cases the incompetency was not discovered until after the trial, whereas in this case he and the trial court were fully aware of the juror's incompetency. The argument has no basis in common sense or precedent. Defendant asks us to conclude that a defendant (or his counsel) who failed to, but should have discovered a juror's incompetency, is precluded from raising the objection after trial, but that a defendant who accepted the juror despite knowing of the juror's incompetency is allowed to so object.

Such is not the law. In *People* v. *Sanford* (1872) 43 Cal. 29, a defendant convicted of murder objected for the first time on appeal to a juror's competency on the ground that the juror's name was not on the property tax assessment rolls. We rejected the objection. "It was the duty of the defendant in the first place to have examined him [the juror] as to his competency in the respect referred to at the time the jury was impaneled. He does not seem to have made any objection to his competency even afterwards, but took his trial before him *with a knowledge of the fact* that his name was on the poll tax list only, and not on the real or personal property tax list. Having deliberately taken his chance of a favorable verdict, he cannot be heard to object now that a juror of his own choosing was lacking in a qualification of this technical character." (*Id.*, at pp. 31-32, italics added.) We more forcefully reiterated this view in *People* v. *Mortier* (1881) 58 Cal. 262: " 'To permit prisoners to avail themselves, after verdict, of preexisting objections to the competency of jurors, as a matter of right, would not only be unreasonable, but most mischievous in its consequences. . . . A prisoner *knowing* or willfully remaining ignorant of the incompetency of a juror, would take the chances of a favorable verdict with him upon the jury; and if the verdict

should be adverse, would readily enough make the affidavit necessary to avoid its effect.' " (*Id.*, at p. 267, italics added, quoting *Commonwealth* v. *Bristow* (Va. 1859) 15 Gratt. 634, 648.) We see no need to depart from the well-established rule.

Defendant compounded his waiver by failing to use all his peremptory challenges. "[T]o complain on appeal of the composition of the jury, the defendant must have exhausted those challenges." (*People* v. *Coleman* (1988) 46 Cal.3d 749, 770 [251 Cal.Rptr. 83, 759 P.2d 1260].) This rule has a pragmatic foundation: If defendant had genuinely desired his case to be tried by a jury that did not include Juror Magann, defendant could have exercised one of his peremptory challenges to exclude Magann. Having failed to do so, defendant has no fair or cognizable ground for complaint on appeal.

In summary, at the time of his trial defendant had no statutory right to only those jurors who resided in the county of trial. He did have a constitutional vicinage right to such jurors, but he waived it as to Juror Magann by declining to object to her despite full knowledge that she was not a resident of the county and by failing to exercise all his peremptory challenges.

Even if defendant had not waived his vicinage right, the trial court's allowing her to sit on the jury would not have been reversible error. His counsel extensively questioned Juror Magann on voir dire. Nothing in the record remotely suggests she held any prejudice or bias against defendant, and he does not contend otherwise. Thus, Magann's inclusion in the jury ". . . did not result in a jury particularly apt to impose the death penalty, and there is no indication that the jury before which defendant was tried was anything other than fair and impartial." (*People* v. *Coleman*, *supra*, 46 Cal.3d 749, 768.)

IV. *Exclusion of statements by McCray and Daniels*

Defendant contends the trial court erred in sustaining the prosecutor's hearsay objection against defendant's proffered testimony as to extrajudicial statements allegedly made to him by McCray and prosecution witness Marta Daniels. Defendant's contention is partly correct, but the trial court's error was not prejudicial to defendant.

A. *Alleged statement by McCray*

The defense was that McCray killed the Brices. Defendant testified that he was present at the jewelry store when McCray entered and began shooting.

Defendant also testified that shortly after he fled the store he saw McCray driving on Foothill Boulevard, that McCray stopped his car, and that he spoke with defendant. The prosecutor objected on hearsay grounds when defendant's counsel asked what McCray had said. Defendant's offer of proof was that McCray had handed a bag of jewelry to defendant and told him, "Here's the jewelry. Would you sell it?" or something like "Would you sell the jewelry? I want you to sell it." The trial court sustained the prosecutor's hearsay objection.

 Defendant contends the alleged statement was not being offered for the truth of the matter asserted but was nonassertive background material that explained defendant's state of mind and conduct. Such extrajudicial statements are not hearsay. (Evid. Code, § 1200; *People* v. *Roberson* (1959) 167 Cal.App.2d 429, 431 [334 P.2d 666]; 1 Jefferson, Cal. Evidence Bench-book (2d ed. 1982) § 1.4, illus. 2, p. 58.) Respondent does not dispute that the proffered testimony would have been relevant to such a showing, but argues that defendant's state of mind was not a material issue. Defendant has the better view. To undercut defendant's contention that McCray killed the Brices, the prosecutor introduced evidence that several witnesses had observed defendant with a large quantity of jewelry like that taken from Brice's store. Defendant attempted to rebut this damaging evidence by showing that he had taken the jewelry *from McCray* because defendant knew McCray was the killer and feared that McCray would kill him if he did not follow McCray's commands.

Defendant's state of mind and ensuing conduct—more particularly, the alleged reason why he took the jewelry from McCray—were disputed intermediate facts. "An intermediate fact of consequence in an action is a fact from which the ultimate fact may reasonably be inferred. Intermediate facts include facts such as the state-of-mind . . . and similar facts from which it may be inferred that the person possessing the particular state of mind or emotion conducted himself in conformity with that state of mind . . . ." (1 Jefferson, Cal. Evidence Benchbook (June 1990 supp.) § 21.3, p. 199.) If the jury believed defendant's assertion that he took the jewelry from McCray because defendant feared for his own safety, the jury could have reasonably rejected the prosecution's implication that defendant had taken the jewelry from the store, which implication pointed to defendant as the killer. The reason defendant had some of the jewelry from Brice's store was therefore an intermediate fact of consequence.

McCray's alleged statement to defendant was relevant to this intermediate fact. (Respondent does not contend otherwise.) "Proffered evidence is relevant to prove or disprove a disputed fact if: [¶] . . . [¶] [s]uch evidence, in

the light of logic, reason, experience, or common sense, has, by reasonable inference, a tendency to prove or disprove such disputed fact." (1 Jefferson, Cal. Evidence Benchbook, *supra*, § 21.3, p. 198; Evid. Code, § 210.) McCray's alleged statement, if believed by the jury, would have tended to prove defendant's explanation of why he had possession of the jewelry.

The alleged statement by McCray was therefore relevant, nonhearsay evidence. The trial court erred in excluding defendant's proffered testimony as to McCray's alleged statement.

The error, however, was not prejudicial. After the trial court sustained the hearsay objection, defendant was nevertheless allowed to testify as follows: "Q: You cannot say what Michael [McCray] said to you. Did Michael give you anything at that time? A: Yes, he did. Q: What did he give you at that time? A: A bag of costume jewelry. Q: Did he tell you what—don't tell me what he did [say], but did he tell you what to do with it? A: Yes, he did. Q: Did you take this bag of costume jewelry? A: Yes, I did. . . . Q: Did you recognize as best you can that kind of jewelry? A: Yes, I did. Q: And where had you seen that type of jewelry before? A: At Anthony's [Brice's] shop." Defendant was allowed to support his contention that he received the jewelry from McCray. Similarly, although the trial court excluded the alleged statement by McCray, defendant was not precluded from testifying as to why he was afraid of McCray or why defendant attempted to sell the stolen jewelry. Finally, in light of the entire record, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)[1]

### B. *Alleged statement by Marta Daniels*

Prosecution witness Marta Daniels, who had lived with McCray for several years and was his "common law" sister-in-law, testified on direct examination that on the morning of the killings she asked defendant to give her a dollar and that he told her he had no money but would have one "when he got through with his lick." To Daniels, a "lick" meant a "robbery," a "scam," a "con," or "any kind of thing where you get something for doing something wrong." Later that same day, August 15, defendant gave Daniels $50 to buy some cocaine. Three days later, she observed defendant with jewelry and watches.

Defendant testified that on the afternoon of August 15, Daniels came to the house where defendant was staying. The prosecutor made a hearsay

---

[1]Defendant makes no direct claim of error under federal law, but he appears to do so indirectly by contending he was denied a full opportunity to present his defense. If, however, there were a federal constitutional violation, we find no prejudice that would require reversal under the rule of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].

objection when defendant was asked to recount the substance of his conversation with Daniels that day. Defendant's offer of proof was, "She [Daniels] asked me if I had sold the stuff [the jewelry].)" The trial court sustained the hearsay objection, explaining that the alleged inquiry by Daniels was being offered to prove the truth of the implied assertion that McCray had told her that he had given the jewelry to defendant.

Defendant contends the alleged question by Daniels as to whether defendant had sold the jewelry was nonhearsay because it was not being offered to prove the truth of the matter implicitly asserted (i.e., McCray's ownership of the jewelry) but rather to explain defendant's state of mind and conduct in giving part of the jewelry to Daniels. We reject the contention for two reasons.

First, in his offer of proof to the trial court defendant contended only that the alleged inquiry by Daniels was not hearsay because it was in the form of a question rather than a statement. Defendant did not assert that the alleged inquiry was in any way relevant to his state of mind or conduct. To preserve an alleged error for appeal, an offer of proof must inform the trial court of the "purpose, and relevance of the excluded evidence . . . ." (Evid. Code, § 354, subd. (a).) This is in accord with "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal.*" (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048], italics added.) Defendant's present contention as to his state of mind comes too late.

Second, Daniels's alleged inquiry was irrelevant. Defendant contends Daniels's alleged inquiry would help to explain why he gave her jewelry. He seems to reason as follows: (1) Evidence that he gave jewelry to Daniels suggested to the jury that defendant had obtained the jewelry and thus was the Brice killer; and (2) the alleged inquiry by Daniels would have contradicted this implication, apparently by suggesting that defendant gave her jewelry because he knew she was a friend of McCray and that defendant was afraid of McCray because the jewelry belonged to McCray rather than to defendant. The first prong of this reasoning is not supported by the record. Daniels did *not* testify that defendant gave her jewelry. To the contrary, she testified that he never gave her jewelry. At the time of defendant's offer of proof, there was no evidence he had given jewelry to Daniels. The reason why he allegedly gave her the jewelry was irrelevant.

Moreover, the subsequent record makes clear that the alleged inquiry *was* being introduced for a hearsay purpose. After the trial court excluded the

evidence, defendant himself testified that he had given Daniels approximately one-half of the jewelry that defendant had allegedly obtained from McCray. The obvious purpose of this testimony, which was contrary to Daniels's testimony, was to suggest to the jury that defendant gave the jewelry to Daniels because it belonged to her friend McCray, rather than to defendant. That implied assertion, in turn, would have tended to support defendant's claim that McCray committed the robbery and killings. The purpose of the alleged inquiry by Daniels was therefore to prove the truth of the implied assertion that the jewelry belonged to McCray rather than to defendant. Defendant's own testimony as to the transfer of jewelry to Daniels was meant to exonerate himself. Defendant's contention that he needed to refute a harmful implication based on his alleged transfer of jewelry to Daniels ignores the fact that defendant himself introduced evidence of the transfer. The trial court did not err in excluding defendant's testimony as to the alleged inquiry by Daniels.

Even if defendant were correct that the excluded testimony would have demonstrated his state of mind or his conduct—the reason why he gave jewelry to Daniels—exclusion of testimony as to Daniels's alleged inquiry was not prejudicial. Defendant was allowed to testify that he gave her the jewelry, and he could have further testified as to why he did so. The choice not to do so was his. Moreover, according to defendant's own offer of proof, Daniels's alleged question was simply whether defendant had sold the jewelry. This question would have added almost nothing to defendant's contention that he was afraid of McCray. It is not reasonably probable in light of the entire record that a result more favorable to defendant would have been reached if the alleged inquiry had been admitted into evidence. (*People* v. *Watson, supra,* 46 Cal.2d 818, 837.)[2]

## V. *Admission of extrajudicial statements by accomplice McCray without cross-examination*

McCray was called by the prosecution to testify. He refused to answer questions, invoking his constitutional privilege against self-incrimination. The prosecution declined to provide McCray with immunity, and both parties acknowledged that McCray's invocation of his privilege rendered him legally unavailable as a witness. (Evid. Code, § 240, subd. (a)(1); *In re Weber* (1974) 11 Cal.3d 703, 721 [114 Cal.Rptr. 429, 523 P.2d 229].) They also agreed that many of his extrajudicial statements were declarations

[2]As with the alleged statements by McCray, defendant makes no direct claim of error under federal law. If, however, there were a federal constitutional violation, we find no prejudice that would require reversal under *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. (Fn. 1, *ante.*)

against his penal interest and were thus admissible as an exception to the hearsay rule in light of his unavailability. (Evid. Code, § 1230.) Defendant, however, moved for permission to question McCray in the jury's presence. The motion was denied.

Defendant contends on appeal that the admission of McCray's extrajudicial statements without the opportunity for cross-examination violated defendant's constitutional right to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) He makes three arguments in support of this contention. As we shall explain, there was no reversible error.

A. *No right to require invocation of the privilege in the jury's presence*

We reject defendant's contention that the trial court erred in denying his motion to require McCray to invoke in the presence of the jury his privilege against self-incrimination. The trial court conducted an *in limine* hearing at which McCray, who was represented by counsel, was sworn as a witness. He was briefly questioned by both the prosecution and defense, but except for admitting that he knew defendant and identifying him in the courtroom, McCray refused to answer any questions regarding the Brice killings. It was clear that McCray would continue to assert his privilege. Both the prosecution and defense declined to continue questioning him.

No valid purpose would have been served by requiring McCray to reassert his privilege in the presence of the jury. "Where, as here, it is apparent that the witness would have offered no testimony in response to questions posed, it is not improper for the trial court to determine that fact in advance and excuse the witness." (*People v. Cornejo* (1979) 92 Cal.App.3d 637, 659 [155 Cal.Rptr. 238].) "In such instance, to require the renewal of the invocation of the privilege before the jury would merely amount to a meaningless ritual." (*People v. Johnson* (1974) 39 Cal.App.3d 749, 760 [114 Cal. Rptr 545].) The lack of any purpose to such a ritual is especially apparent in this case. The only conceivable reason for requiring McCray to invoke his privilege in the jury's presence would have been to inform them of the reason why he did not testify. The trial court, however, informed the jury that, "The court is taking judicial notice of and hereby advising the jury that Michael McCray was called as a witness in this case outside the presence of the jury, and that Michael McCray with advice of his counsel refused to testify, *basing his refusal upon his constitutional privilege against self-incrimination*." (Italics added.) The jury was clearly and adequately informed of the reason why McCray did not testify. The jury was not left to speculate as to why McCray's statements were admitted into evidence without his having to

testify. Requiring McCray to invoke his privilege in the jury's presence would have served no proper purpose.

Rather, the only apparent purpose to invoking the privilege before the jury would have been to call McCray's credibility into question, that is, to allow the jury to infer that his extrajudicial statements were unreliable *for the very reason that* he was subsequently invoking his testimonial privilege. As we recently explained, however, any such inference is prohibited by Evidence Code section 913, subdivision (a). (*People* v. *Mincey* (1992) 2 Cal.4th 408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197].)

Defendant asserts a conflict in California law, relying on *People* v. *Chandler* (1971) 17 Cal.App.3d 798 [95 Cal.Rptr. 146]. His reliance is misplaced. The court in *People* v. *Johnson, supra,* 39 Cal.App.3d 749 (*Johnson*), correctly explained *Chandler* as follows: "[T]he court *held* that no pretestimonial hearing is *required* in order to precipitate the invocation of the privilege (*People* v. *Chandler, supra,* at pp. 804-805). That holding, however, does not stand for the proposition that such a pretestimonial hearing *may not* be held in order to determine whether or not the witness is entitled to the privilege." (*Johnson, supra,* 39 Cal.App.3d 749, 758, original italics.) The *Johnson* court observed, however, that in *Chandler, supra,* 17 Cal.App.3d 798, the court had suggested in dictum that the privilege should be invoked in the jury's presence. We agree with the *Johnson* court, *supra,* 39 Cal.App.3d 749, that the suggestion in *Chandler, supra,* 17 Cal.App.3d at pages 804-805, is unpersuasive, and we disapprove *Chandler* to that extent.

Defendant relies even more extensively on a decision by the Pennsylvania Supreme Court. (*Commonwealth* v. *Sims* (1987) 513 Pa. 366 [521 A.2d 391].) Like the trial court, we conclude that *Sims* does not support defendant's view. As in the present case, the defendant in a murder trial claimed innocence and contended one of his accusers was the killer. (*Id.,* at p. 371 [521 A.2d at p. 395].) The accuser, Hilton, was granted immunity from prosecution and testified at trial against the defendant. The defense attorney sought to cross-examine Hilton as to communications by Hilton to his attorney. These communications were protected from disclosure by that state's statutory attorney-client privilege. The defendant contended, however, that the witness should have been compelled "to claim his 'attorney-client privilege' in front of the jury." (*Ibid.*) The court agreed because ". . . the invocation of that privilege before the jury could have reasonably provided the basis for that tribunal to question the accusations made by that witness against the accused." (*Ibid.*) The jury in the present case, however, *was* informed that McCray had invoked his privilege against self-incrimination. The potential unfairness that concerned the *Sims* court did not arise in the present case.

More important, the *Sims* court, *supra*, 513 Pa. 366 [521 A.2d 391], explicitly limited its decision, noting that a jury may not draw any inference from a witness's exercise of a constitutional right and that ". . . here we are not concerned with a constitutional privilege but rather one that is of statutory origin." (*Id.*, at p. 377, fn. 1 [521 A.2d at p. 396].) The privilege against self-incrimination is, of course, constitutionally mandated. On its face, *Sims* does not support defendant's claim. Indeed, after *Sims* was decided, Pennsylvania's intermediate appellate court rejected the precise claim made by defendant. A witness was called to testify against the defendant, but as in the present case, the witness invoked his privilege against self-incrimination when questioned outside the jury's presence. Relying in part on *Sims*, the court held, "We find no merit in appellant's contention that he was denied the right of confrontation because the trial court refused to allow DeLeo's [the witness's] invocation of the privilege against self-incrimination before the jury." (*Commonwealth* v. *Yabor* (1988) 376 Pa.Super. 356, 361 [546 A.2d 67, 69].)

We hold that the trial court did not err in refusing to require McCray to invoke his privilege against self-incrimination in the presence of the jury.

B. *No right to cross-examine McCray at trial*

■ Defendant contends his constitutional right to confront the witnesses against him was violated because he was not allowed to cross-examine McCray regarding his extrajudicial statements that were admitted into evidence. He relies principally on *Chambers* v. *Mississippi* (1972) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038] for the court's observation that the right of cross-examination "is implicit in the constitutional right of confrontation . . . ." (*Id.*, at p. 295 [35 L.Ed.2d at p. 309].) That principle is, of course, indisputable under both the federal and California Constitutions. (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 678 [89 L.Ed.2d 674, 682-683, 106 S.Ct. 1431]; Cal. Const., art. I, § 15.) The question raised by defendant, however, is whether his constitutional right to confront the witnesses against him supersedes the witness's constitutional right against self-incrimination. The answer is clear. In *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920], the court held that the federal constitutional right to compulsory process for obtaining witnesses (U.S. Const., 6th Amend.) applies to the states through the Fourteenth Amendment. The court cautioned, however, that "Nothing in this opinion should be construed as disapproving testimonial privileges, *such as the privilege against self-incrimination* . . . ." (388 U.S. at p. 23, fn. 21 [18 L.Ed.2d at p. 1025], italics added.) Defendant was not entitled to have McCray deprived of McCray's constitutional right against self-incrimination.

C. *Admission of McCray's extrajudicial statements*

By his own characterization, defendant's main objection to McCray's extrajudicial statements is that their admission violated defendant's constitutional rights of confrontation and cross-examination as defined in *Bruton* v. *United States* (1968) 391 U.S. 123, 126-127 [20 L.Ed.2d 476, 479-480, 88 S.Ct. 1620] (*Bruton*), and *People* v. *Aranda* (1965) 63 Cal.2d 518, 528-530 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*). The principle is well established: "[A] nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant *is generally unreliable and hence inadmissible* as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1120 [240 Cal.Rptr. 585, 742 P.2d 1306], italics added.)

The facts of this case arguably might bring it within the "*Bruton-Aranda*" proscription (*Bruton, supra,* 391 U.S. 123; *Aranda, supra,* 63 Cal.2d 518). McCray, having invoked his privilege against self-incrimination, did not testify at trial. There is authority for the view that McCray's status as an uncharged accomplice rather than as a codefendant is of no consequence. (*People* v. *Coble* (1976) 65 Cal.App.3d 187, 194 [135 Cal.Rptr. 199].) McCray's extrajudicial statements to the police clearly inculpated defendant, and respondent does not contend otherwise. There is no other apparent reason why the prosecution introduced the statements. We need not and do not decide, however, whether the statements should have been excluded if defendant had timely and specifically objected on the *Bruton-Aranda* grounds.

Defendant, however, made no such objection, thereby waiving his present contention. As explained above, defendant's response to the introduction of McCray's statements was that McCray should have been subjected to cross-examination or, alternatively, been required to invoke his Fifth Amendment privilege in the jury's presence. Even now on appeal, defendant contends he was denied the right to cross-examine McCray, that McCray should have been granted immunity and compelled to testify, and that at a minimum McCray should have been required to invoke his privilege before the jury. These arguments miss the mark. Faced with evidence that is inadmissible on *Bruton-Aranda* grounds, the proper objection is to exclude the statements, not to subject the declarant to cross-examination. If the declarant is properly subject to cross-examination, no *Bruton-Aranda* problem arises in the first instance.

The record does not show that defendant *specifically* objected on *Bruton-Aranda* grounds to admission of McCray's statements. "Absent a timely and

specific objection on the ground defendant now asserts on appeal, his contention is deemed waived." (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1044 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [finding waiver of *Bruton-Aranda* objection]; *People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330].) Not only did defendant withhold his objection to the statements, defendant himself agreed to, indeed sought, their admission. After McCray was called as a witness and made clear that he would invoke his Fifth Amendment privilege, the prosecution and defense agreed that McCray was unavailable as a witness under Evidence Code section 1230 and that his extrajudicial statements could be admitted to the extent they were declarations against his penal interest. In a discussion with the trial court, the prosecution stated his understanding that *defendant* wished to introduce such statements by McCray. Defense counsel did not contend otherwise, and in fact, shortly thereafter, he confirmed his intent to introduce McCray's statements.

The trial court, prosecution, and defense proceeded to review McCray's statements in detail to determine which of them were admissible as declarations against penal interest. Defense counsel informed the court that the only disagreement would be as to which of McCray's statements were inculpatory and therefore against his penal interest. At no time during this process did defense counsel object to any of McCray's statements in whole or in part based on the *Bruton-Aranda* rule. ■■■ ■ ■■ ■■ Defendant has waived any objection on that ground. (*People* v. *Mitcham, supra,* 1 Cal.4th 1027, 1044.)[3]

Even if the objection had been timely raised, the record amply demonstrates that the admission of McCray's statements was not prejudicial to defendant. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) The most telling sign of an absence of prejudice is that defendant

---

[3]Defendant contends on appeal that respondent has conceded the alleged *Bruton-Aranda* error because respondent does not address that issue in respondent's brief to this court. We reject this novel contention for three reasons: (1) As explained above, *defendant* is the one who waived the alleged *Bruton-Aranda* error by failing to raise it in the trial court. (2) In his own opening brief, defendant's primary argument against the admission of McCray's extrajudicial statements was that McCray should have been forced to testify and be subject to cross-examination. Respondent did fully respond to that argument, and defendant does not contend otherwise. (3) We decline to find a waiver based on nothing more than respondent's failure to respond to defendant's *Bruton-Aranda* argument, which was itself raised for the first time on appeal. Such a rule would require a party to respond to his opponent's every argument, subargument, and allegation, no matter how meritless or briefly made. A failure to respond to an opponent's argument may be unwise as a tactical matter, but such failure does not warrant the inflexible rule proposed by defendant. That is not the law, and we disapprove of the brief and unsupported suggestion to the contrary in *People* v. *Adams* (1983) 143 Cal.App.3d 970, 992 [192 Cal.Rptr. 290].)

himself sought to rely on McCray's statements in large part, for the obvious reason that defendant thought they would help exculpate him. When the statements were reviewed with the trial court and the prosecution, defense counsel stated, "I foresee that we won't really have too much of a problem in deciding what are penal interest, which are declaration[s] against penal interests." The prediction proved correct. Defense counsel made very few objections to the admitted portions. He contends on appeal that, "The fact appellant used *certain* statements made by McCray does not constitute a waiver of *all* statements made by McCray." Defendant, however, fails even now to identify which portions of McCray's statements were allegedly prejudicial. In effect, defendant asks this court to speculate as to which portions he wanted admitted and which portions were allegedly prejudicial to him. It is not incumbent on us to do so.

In an abundance of fairness to defendant, however, we have carefully reviewed the portions of McCray's statements that were admitted to the jury and the process by which they were admitted. The record reflects that, with only two minor exceptions, defense counsel either actively sought or acquiesced without objection to all portions that were admitted. Trial counsel's desire—or, at a minimum, willingness—to put such evidence to the jury weighs heavily against the claim on appeal that the evidence was prejudicial. Moreover, the trial court carefully considered the few objections raised by counsel, and as a result, only two brief portions of McCray's statements to the police were admitted over defendant's objection. One was as follows: "Q: What did you tell Anthony to do, er now, I mean Michael [the defendant] to do regarding the bill he owed you? A: He was gonna pay it. He said he was going to pay cash." The other portion admitted over objection was: "Q: Did you give Mike [defendant] a gun on that occasion [the day of the killings] when he came by? A: When he came by? No, he had it. I don't know if he had it on him then or not. Q: Did Mike give it back to you and you give it back to Mike? A: Then? Q: Yeh. A: No, after he came he tried to give it back to me." In light of the extensive other evidence against defendant, we conclude these two isolated portions of McCray's statements were harmless beyond a reasonable doubt because they could not have contributed to the verdict. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) The fact that defendant requested or acquiesced in the admission of much more extensive and arguably more damaging portions of McCray's statements further supports our conclusion.

VI. *Absence of instruction that McCray was defendant's accomplice*

Defendant contends the trial court erred by not sua sponte instructing the jury that "if it determined appellant [defendant] participated in the Brice

robbery/murders then McCray was an accomplice as a matter of law and his testimony must be viewed with distrust." We reject the contention. There was no error, and there was no prejudice.

Defendant testified that he allowed McCray entry into the locked store and that McCray shot the Brices. Defendant admitted he knew when he opened the door that McCray was going to rob Brice. The prosecutor contended this testimony, although it seemed to shift blame for the actual shooting to McCray, gave rise to an additional theory of defendant's culpability for the murders, that of an aider and abettor. The prosecutor requested an instruction that McCray was defendant's accomplice as a matter of law. The trial court sustained *defendant's* objection to the proposed instruction.

### A. *No error*

■ Defendant contends that, despite his objection, the trial court had a sua sponte duty to give the instruction he now advocates. He asserts it is different from the instruction proposed at trial because the present instruction would have required the jury to find that McCray was an accomplice only *if the jury determined that defendant himself participated in the robbery and killings.* Even if the two instructions were different in any meaningful respect, a dubious conclusion, the trial court had no sua sponte duty to give the instruction defendant now proposes for the first time. Defendant argues in effect, not that the instruction to which he objected was incorrect, but that the instruction he now proposes would have been more accurate based on the facts. The rule, however, is that " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1218 [283 Cal.Rptr. 144, 812 P.2d 163], quoting *People* v. *Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].)

Moreover, the proposed instruction might have been more harmful than helpful to defendant. The gist of defendant's argument is that: (1) *if* the jury believed that he participated in the crimes, (2) McCray was his accomplice, and (3) McCray's testimony should be viewed with distrust. The point of this contention seems to be that if the jury viewed McCray's testimony with distrust, they would have concluded that defendant was not the actual shooter. To reach this point, however, the jury would first have had to conclude under the instruction that defendant himself participated in the killings. That conclusion seems to us far more damaging than the mere admonition to distrust McCray's testimony. Moreover, by informing the jury that McCray was *defendant's* accomplice (rather than defendant being *Mc-Cray's* accomplice), the instruction might have led the jury to believe that

defendant was the more culpable of the two. (That may well be the reason why trial counsel never requested any such instruction.) At best, the instruction would have confused the jury (just as it perplexes us); at worst, it could have led them to convict defendant based on the acts of McCray. We decline to impose on the trial court a sua sponte duty to conjure up an instruction of such dubious benefit.

Our conclusion of no error is reinforced by defendant's own decisions at trial. The trial court carefully considered how to instruct the jury as to accomplice testimony, and defendant's counsel concurred in the court's proposed instruction. The following excerpt demonstrates the point:

"The Court: Next we have [CALJIC] 3.10. This is the one we went over quite—again, because this is a situation where—unusual in that each side feels the other was an accomplice, that in a sense McCray was an accomplice from the defense standpoint, that Hill was an accomplice of McCray in letting him in [the Brices' store]. [¶] The court has, of course, discussed this at length, and one of the things which we decided is that the accomplice instructions are meant to assist the jury in weighing testimony of accomplices and the need to corroborate testimony of accomplices. [¶] The defense obviously wants the jury to distrust McCray's statements, not only from what it says here is an accomplice and from the District Attorney's standpoint of giving the gun and giving part of the proceeds, but also from the standpoint he thinks he's the one that did it and went in and shot. [¶] So we have neutralized to some extent to show that either theory can be argued and I will leave it to each of you to argue. What I'm going to do is give [CALJIC] 3.10 and add the following clause at the conclusion of that, 'or himself personally committed the act constituting such offense,' because obviously the coactor would each be an accomplice of the other under the facts which we have here. [¶] So that leaves each one of you free to argue from the District Attorney's standpoint obviously that McCray is the accomplice of Hill, having given him the gun and shared thereafter in the proceeds and knowing him intentionally doing so, *and from the defense standpoint to argue that McCray is an accomplice, but only from the standpoint he [McCray] really did it himself and that Hill let him in and was therefore an accomplice.* [¶] The court would thereafter give the necessary accomplice instructions about corroboration and judging them carefully, [CALJIC] 3.11, 3.12, 3.14, 3.18. The court is intentionally not giving 3.13 and it was agreed that they were talking about one accomplice may not corroborate another. Both sides felt that did not apply in this case, correct? *Defense counsel:*

*That's correct your honor*. Prosecutor: Yes, your honor."[4] (Italics added.) The foregoing colloquy shows that defendant concurred in the trial court's carefully crafted attempt to give accomplice instructions that fit the peculiar facts of this case.

In light of defendant's objection to the initial accomplice instruction proposed by the trial court and his participation and acquiescence in crafting the accomplice instructions ultimately given, there is no principled basis on which to conclude that the trial court had a sua sponte duty to give the unique instruction now proposed by defendant.

### B. *No prejudice*

Even if by some stretch of the imagination we were able to find error (which we decline to do), we would be unable to find any prejudice to defendant. As explained above, the proposed instruction would have been of dubious benefit to defendant. Moreover, based on the competing versions of the facts, McCray was the only possible accomplice of defendant. (Defendant does not contend otherwise.) The jury was fully instructed that defendant could not be found guilty based on an accomplice's testimony without corroboration and that an accomplice's testimony should be viewed with distrust. Finally, considerable other and more damaging evidence in addition to McCray's testimony pointed to defendant as the killer. It is not reasonably probable that a verdict more favorable to defendant would have been reached if the instruction had been given in the form requested. If there had been error, it would have been harmless under any standard. (*People v. Watson, supra,* 46 Cal.2d 818, 836; *Chapman v. California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

### VII. *Alleged spectator misconduct*

Defendant contends three instances of spectator remarks mandate reversal. "We have found no California cases which reverse a judgment because of spectator misconduct." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1023, fn. 10 [245 Cal.Rptr. 185, 750 P.2d 1342].) This will not be the first. Any objection to the spectators' remarks was waived, and, in any event, they were not prejudicial. The three instances were brief and isolated, two of them were unrelated to defendant's guilt or innocence, and the jury was properly admonished to disregard spectator remarks.

---

[4]The instruction ultimately given was: "An accomplice is one who is subject to prosecution for the identical offense charged against a defendant on trial. To be an accomplice the person must have aided, promoted, encouraged or instigated by act or advice the commission of such offense with knowledge of its unlawful purpose of the person who committed the offense or himself personally committed the act constituting such offense."

### A. *Waiver*

Defendant neither objected to any of the three instances of spectator remarks nor requested the trial court to admonish the jury to disregard the remarks. He also failed to move for a mistrial after any of the remarks. Defendant's failure to request appropriate ameliorative action waived his appellate challenge to the remarks. A defendant's failure to object and request a curative admonition for alleged prosecutorial misconduct waives the issue for appeal if the objection and admonition would have cured the misconduct. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 79 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Sully, supra,* 53 Cal.3d 1195, 1248; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) We see no reason why the same rule should not apply to alleged *spectator* misconduct. Indeed, because a spectator does not wear the same cloak of official authority as a prosecutor, most instances of spectator misconduct will likely be more easily curable than those of a prosecutor. Prior decisions on spectator misconduct implicitly suggest that a defendant cannot first raise the issue on appeal. The question has invariably been whether the trial court should have granted the defendant's motion for a mistrial based on alleged spectator misconduct. (*People* v. *Lucero, supra,* 44 Cal.3d 1006, 1022; *People* v. *Miranda* (1987) 44 Cal.3d 57, 114 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Craig* (1978) 86 Cal.App.3d 905, 918 [150 Cal.Rptr. 676]; *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 882-883 [125 Cal.Rptr. 442]; *People* v. *Spain* (1984) 154 Cal.App.3d 845, 851 [201 Cal.Rptr. 555]; cf. *People* v. *Horowitz* (1945) 70 Cal.App.2d 675, 698 [161 P.2d 833] [failure to object to a particular spectator's presence waived issue on appeal].) In none of those cases was the issue raised for the first time on appeal.

We now make explicit what has long been implicitly clear. A defendant's failure to object to and request a curative admonition for alleged spectator misconduct waives the issue for appeal if the objection and admonition would have cured the misconduct. As explained below, the spectator misconduct in this case was easily curable (and in fact was cured) by appropriate admonition. Defendant in this case requested no amelioration. His claim of spectator misconduct is waived.

### B. *Absence of prejudice*

Aside from defendant's waiver of the issue, his claims of reversible spectator misconduct are baseless.

#### 1. *First remark by Mrs. Brice*

Dr. Thomas Rogers, a pathologist who was the first witness at trial, testified that morphine had been found in Brice's urine during the autopsy. A

woman, apparently Brice's mother, interrupted the questioning as follows: "Q: Do you have any idea what kind of substance it may have been that Mr. Brice had taken? A: Most likely, this would have been heroin unless he had been on prescription for—Woman in Audience: My son has never used a needle. He's never used a needle. The Court: Ma'am. Remain outside. Woman in Audience: Well, you know, he never used a needle. The Court: We'll take a moment recess please. Ask the witness [*sic*] to step outside till she composes herself. Spectator will have to remain outside until after this testimony is completed I believe. She may come back in afterwards."

This comment was brief and on the first day of a guilt phase trial that spanned more than 24 calendar days. The comment had nothing to do with defendant's guilt or innocence. The court's order for the spectator to leave the courtroom made clear to the jury her remark was inappropriate. More-over, at the end of the first day of trial, the court adequately admonished the jury that, "We did have a brief statement of somebody in the audience who said something on one occasion, and maybe on a second, and I certainly admonish them and will continue to admonish all persons in the audience not to say anything. And if you did hear any words or noticed anything, any reaction by spectators, I tell you must not in any way let these things affect you. Completely disregard them. Now someone in the audience obviously is not under oath and their reactions have no value to you whatsoever as the finders of fact. As I say, hopefully, there will be no further things like that occurring, but please just disregard them." In light of the nature and circum-stances of the comment and the court's forceful admonition to disregard it, there is not even a plausible basis on which we could find prejudice to defendant.

### 2. *Remark by unidentified spectator*

 Later on the first day of trial, Darlene Brice, who was Brice's wife and Anthony's mother, was being examined by the prosecutor. "Q: When was the funeral? What date was the funeral of your son and your husband? A: August 21st, I believe. Q: August 21? A: Yes. *Member of the Audience (unidentified): Twenty-first.* The witness: Yes." (Italics added.) This is barren ground in which to root a claim of prejudice. This momentary, two-word utterance did not refer to defendant or the circumstances of the crime. Defendant contends only that the mention of the date, "made it clear that members of the audience were very close to the case." We are not persuaded. The assumption is questionable and, even if true, fails to show prejudice. Moreover, the trial court immediately cautioned that, "I heard something from the audience. Somebody made a statement as to the answer to a question, but somebody in the audience must not speak out in any way,

shape or form." And as explained above, the jury was firmly admonished at the end of the day to disregard spectator remarks.

### 3. *Remark during closing argument*

During his closing guilt phase argument, defense counsel was interrupted as follows: "[Counsel:] Michael Hill, according to his testimony, and, you know, depends on how you interpret the evidence, never had the specific intent permanently to deprive such person [the victims] of the property. Where in the evidence do you see him depriving—where in the evidence do you see anywhere of Michael Hill himself having that intent permanently to deprive the possessor of his property if he does what he says he did? You see, everything I'm saying is conditioned on Michael Hill being an aider—*Member of the Audience (unidentified): Don't make it like that, him killing my kids, all I had. The Court: Ladies and Gentlemen—Member of the Audience (unidentified): That was all I had.* The Court: For the record, ladies and gentlemen, someone in the audience has left the courtroom and was saying some words as she left, apparently in tears and upset. I realize it's difficult but you must lock that from your minds and consideration in all ways, shapes and forms. I'm sorry for the interruption. You may continue, counsel." (Italics added.)

The record does not establish the identity of the spectator. Both respondent and defendant state that she was Brice's mother, the same spectator who spoke out on the first day of trial, and the nature of the remarks support that conclusion. We will therefore assume it to be correct for the purpose of discussion. Her identity, however, does not affect our analysis. Even if the jury somehow surmised from her comments and her prior interjection (on the first day of trial) that she was Brice's mother, there was no prejudice. In *People* v. *Lucero, supra,* 44 Cal.3d 1006, we rejected a claim of prejudicial spectator misconduct on facts far more egregious than here. As in this case, the mother of a murder victim became hysterical during the defendant's guilt phase closing argument. Her outburst was far more extensive and chilling (relating as it did to the victim's screams) than in the present case, and, as we put it, the trial court's admonition was "cursory." (*Id.,* at pp. 1021-1022.) We found no prejudice. In the present case, the outburst was abbreviated, and the jury was promptly and thoroughly admonished. We reiterate that, "In such cases [i.e., spectator misconduct] prejudice is not presumed. Indeed, it is generally assumed that such errors are cured by admonition, unless the record demonstrates the misconduct resulted in a miscarriage of justice." (*Id.,* at p. 1023, fn. 9.) The record in this case establishes no prejudice.

## JUROR SELECTION ISSUES

### I. *Exclusion of prospective jurors for cause*

Defendant contends the trial court erred in granting the prosecutor's request to exclude three prospective jurors from the panel for cause based on their stated reluctance to impose the death penalty. (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 516, fn. 9 & 522, fn. 21 [20 L.Ed.2d 776, 781, 785, 88 S.Ct. 1770] [*Witherspoon*] and *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) We find no error.

### A. *Prospective juror Harry Kreisler*

 Defendant has waived his objection to the exclusion of Harry Kreisler. The record reflects the following colloquy between the court and counsel immediately after Mr. Kreisler was excused for cause: "The court: I just wanted to make the record clear by their actions that both sides felt that was something where probably he should be excused. Mr. Selvin [defense counsel]: *Yes.* Mr. Anderson [prosecutor]: For the record, I did impose the challenge. I don't know if it was picked up for the record but I did. Mr. Levy [defense counsel]: Think of the great arguments he could have had with the other jurors." (Italics added.)The record is unequivocal. Defense counsel joined in the request to excuse Mr. Kreisler for cause. The objection comes too late.

Even if the objection were timely, we would reject it. "[A] defendant's Sixth and Fourteenth Amendment right to an impartial jury is not compromised by the excusal of a prospective juror whose views about capital punishment give the 'definite impression' that those views would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." ' " (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 45, quoting *Wainwright* v. *Witt, supra,* 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852].) More specifically, the determinant is "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*" (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 45, fn. 16, italics added.) After extensive questioning, and being informed of the nature of the crimes in this case, Mr. Kreisler was pressed by the prosecutor for an unequivocal position. "You're going to have to have [*sic*] a situation where if you are either not the foreman but on the jury panel you're going to be asked by the court, is this your true and original verdict. You're going to have to look at the lawyer and the defendant, and maybe the defendant's family in the face, and say, yeah, I'm condemning you to die. That's the bottom line. You are dying by my

verdict. Now, could you do that? A: I don't know. You want me to decide right now, I guess. Q: Either for my question or Judge Byers' question. A: Well, I guess I couldn't." The trial court then pursued the matter a bit longer, concluding with this question: "Could you impose the death penalty verdict and if need be, state, yes, that is my true and individual verdict knowing that it will mean that this person will be put to death?" Mr. Kreisler responded, "No, I don't think I could." Mr. Kreisler made clear that his views would impair his ability to impose the death penalty in t his case. There was no error. (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 45, fn. 16.) Even viewed most generously to defendant, the best that could be said of Mr. Kreisler's answers is that they were conflicting and equivocal. The trial court's determination to excuse him is therefore binding on this court. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1224 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Morris* (1991) 53 Cal.3d 152, 186, fn. 4 [279 Cal.Rptr. 720, 807 P.2d 949].)

## B. *Prospective juror Scott Moore*

 Scott Moore also raised sufficient doubts as to whether he could impose the death penalty in this case. He began by stating that he would not automatically vote against the death penalty and went on to explain that about 10 to 15 years earlier he had been "totally against it," but that he had come to believe that it was appropriate for serial murderers. After being told the nature of the crimes in this case, he was questioned by defense counsel. "As you're thinking about this, do you have a leaning one way or the other? A: You know, I should have thought about this earlier before I even came in here, to tell you the truth. . . . [Court admonition to speak into the microphone.] I honestly don't know if I could, you know, get through the choice of life without parole without him getting out. I honestly don't know if I could vote for the death penalty, to be honest with you. I really don't know if I could. Q: It's okay for you not to know. A: Yeah. Q: But the question is—A: I mean, I can do life without parole, but, you know, without hearing the rest of the case, I don't know if I could, you know, vote for the death penalty." Mr. Scott then stated in response to further defense questioning that he could "consider" the death penalty.

The prosecutor then questioned Mr. Scott. "Were we to use a scale of one to ten . . . assuming that one is a person who would almost never impose it [the death penalty], sometimes would, and ten we have the most strident advocate of the death penalty, can you see placing yourself in a numerical classification of where you would stand? A: Yeah, it would be the one. That would be the most, you know, yeah." In response to further questions, he repeatedly stated that, "I really don't know if I could [impose death]" and "I

don't think I could." When pressed for a more definitive answer, he responded, "You want a yes or no answer right now. I guess no then. If I can't be positive, I guess that's the answer."

Finally, the trial court asked, "Can you keep your mind open for one or the other, but you have to be able to vote for that other one may not be the one you want? A: I don't think I could vote for the death penalty. . . . The Court: I have to have a yes or no. A: No."

Mr. Scott's answers make amply clear that he would have had almost insurmountable difficulty in imposing the death penalty. He was properly excused for cause. (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 45, fn. 16; *People* v. *Morris, supra,* 53 Cal.3d 152, 186, fn. 4.)

### C. *Prospective juror Colleen Soper*

 Colleen Soper's initial response to the court's questioning was that, "I would feel uneasy about the death penalty." Although she equivocated in response to further questions, she repeatedly expressed significant doubts as to whether she could vote for the death penalty, for example, "I can't say that I would want to see anyone die for whatever reason." Ms. Soper was then questioned by defense counsel. "Q: Your beliefs with regard to the death penalty, are they based on any religious principles? A: Yes, I would have to say yes. My parents are Jehovah Witnesses and they're totally against it and I told them that I was involved in this sort of thing, this sort of trial, and I just don't feel very well about it. I don't really have a chosen belief myself but I don't feel right about it personally." After further examination by the court, Ms. Soper twice made clear that she could not vote for the death penalty in this case. Her answers make clear that she was properly excused for cause. (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 45, fn. 16; *People* v. *Morris, supra,* 53 Cal.3d 152, 186, fn. 4.)

### II. *Prosecutor's exercise of peremptory challenges*

 Defendant contends the prosecutor's exercise of peremptory challenges to six prospective jurors (including one alternate) who held reservations as to the propriety of the death penalty violated his constitutional rights to a fair and impartial jury and equal protection because the procedure necessarily resulted in a jury more willing to execute him than not to do so. Defendant waived any error in this regard by failing to object to the prosecutor's challenges. (*People* v. *Morris, supra,* 53 Cal.3d 152, 186.)

Moreover, defendant admits that California law is to the contrary of his claim of error. (*People* v. *Morris, supra,* 53 Cal.3d 152, 186; *People* v.

*Marshall* (1990) 50 Cal.3d 907, 927 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another point in *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1115.) He also admits that the federal district court decision on which he relies was reversed on appeal as to this point. (*Brown* v. *Rice* (W.D.N.C. 1988) 693 F.Supp. 381, 393, affd. in part and revd. in part (4th Cir. 1989) 891 F.2d 490.) Despite the lack of any supporting authority, he urges us to reconsider our position. We decline to do so.

PENALTY PHASE FACTS

### I. *The prosecution*

Defendant was convicted in March 1978 of a felony, the sale of heroin in violation of Health and Safety Code section 11351. He received a sentence of probation.

Clifford Turner, the jailhouse informant who incriminated defendant at the guilt phase (see p. 976, *ante*), testified that, while he was incarcerated with defendant at the Santa Rita jail, he (Turner) beat up inmate Ronald Sampson at defendant's request. Turner reported the beating to defendant, who said "Right on." Deputy Sheriff David Wysock testified that on January 20, 1986, he was on duty at the jail and found inmate Sampson bleeding in the day room. Sampson said he had been beaten by three inmates, but he did not identify them. Turner had been in custody in the day room with Sampson at the time of the attack.

### II. *The defense*

Several of defendant's family members—a sister, three cousins, his wife's uncle and a "foster auntie"—and a clinical social worker and a psychiatrist testified that defendant was reared in a dysfunctional family setting and had a difficult childhood. He was born out of wedlock. His father deserted the family when defendant was very young. He and his sister were raised by their mother, who had several serious medical problems including a colostomy and morbid obesity. (She weighed 400 to 500 pounds.) The mother supported herself by staying on the public welfare roles, renting rooms to prostitutes, and selling illegal drugs, often with defendant's assistance.

Defendant first consumed marijuana when he was seven years of age and began selling it when he was eleven. He also began committing a series of other crimes, e.g., petty theft, when he was 11, and by the age of 14 had committed assault with a deadly weapon. He dropped out of school around

the 11th grade . He obtained his first legal employment when he was 19 and thereafter held a series of jobs. He continued to sell illegal drugs. He begat a number of children by a series of women. He was married twice. The first marriage was annulled, and he was either separated or divorced from his second wife at the time of his arrest in this case.

The husband of defendant's second wife's aunt described defendant as being a "beautiful person," and having a "beautiful" relationship with his child by his second wife.

A woman who described herself as being defendant's "fiancée" testified that defendant relates "beautifully" to children and that, since his incarceration in this case, she and defendant have discussed starting some type of program to help children stay out of trouble. She said defendant has a good mind. She intends to marry him despite his death penalty.

Dr. Richard D. King, a physician who practices psychiatry, gave his opinion on the effects that defendant's "God awful" upbringing had on his personality and portrayed defendant as being "a person who doesn't just have one core personality type, that there are other personality fragments." Dr. King admitted on cross-examination that he was not board certified in psychiatry.

Dr. H. R. Kormos, a board certified psychiatrist, testified about the possible effects of toxic psychosis caused by cocaine and opined that a person under the influence of cocaine has difficulty assessing the consequences of his actions. Dr. Kormos had never examined defendant.

## PENALTY PHASE ISSUES

### I. *Prosecution misconduct in closing argument*

Defendant contends the prosecutor's penalty phase closing argument constituted prejudicial misconduct in two respects: (1) The prosecutor urged the jury to impose the death penalty to foreclose the possibility that defendant might someday be released from prison. (2) The prosecutor repeatedly relied on biblical passages as support for the death penalty. Defendant's first contention is well taken, but only up to a point. The prosecutor erred in relying on speculative future events, but the error was not prejudicial. Defendant's challenge to the religious references was waived by failing to object at trial.

### A. *Speculation as to future release from prison*

Defense counsel's psychiatric expert, Dr. Richard King, testified that defendant had revealed a dream in which he was taken from prison to the

White House and was pardoned by then-President Ronald Reagan. During closing argument, the prosecutor first referred to this dream as evidence of defendant's inflated sense of self-importance, "[This] just shows you how important he feels he is, the real big shot, the real big shot." Defendant did not object and does not now ascribe any error to this limited reference to the dream.

 The problem arose when the prosecutor began arguing as to the future effect of the jury's choice between the death penalty and life in prison without the opportunity for parole. "[I] just want to remind you that the *defendant has hopes and dreams of getting a pardon in this case right from President Reagan. Now, I'm asking you to foreclose any hopes that he has of ever getting out.* I mean he has hopes—." (Italics added.) Defense counsel promptly objected on the ground, "L-WOP [life without parole] means L-WOP," but that the prosecutor was seeking to persuade the jury that defendant might be released from prison unless the death penalty were imposed. The court admonished the prosecutor not to refer to the "powers of any authority whatsoever," but otherwise overruled the defense objection. The prosecutor resumed his argument, "As I was indicating, he has these hopes and dreams of someday getting out. I mean who knows what miracles can happen in the future. Earthquakes do occur. Social revolutions do occur. Even wars occur. He has hopes of getting out. How many of you ever saw the movie the Dirty Dozen [in] which [actor] Lee Marvin took 12 condemned men during the time of war, went off and fought in Germany, 12 condemned men, some got field commissions and went out and fought. Defense: I object. This is going beyond the scope of the discussion. The Court: Overruled. Prosecutor: Who's to say that can't happen in modern times due to the chaos in the Middle East today? Who's to say that can't happen? A death penalty verdict gives him the same hope that he gave to the Brices and that's none at all."

Even though the prosecutor did not explicitly state that defendant might in fact receive a presidential pardon, the obvious implication of the prosecutor's argument was that the jury had to impose the death penalty to foreclose the possibility, albeit remote, that defendant might somehow be released from prison by a pardon or other means. No other purpose is apparent from the face of the argument, in particular the references to President Reagan and the motion picture in which military convicts accepted a combat mission in the hope of obtaining pardons. The trial court itself apparently understood this to be the point of the prosecutor's remarks, admonishing him to desist from referring to the "powers of any authority whatsoever."

In several respects this portion of the argument was error under *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos*), in

which we condemned as invalid under the California Constitution the use of a jury instruction that a sentence of life without the opportunity for parole might be commuted by the Governor (the "Briggs Instruction"). (*Id.*, at pp. 153-155.) Although the error in *Ramos* was instructional, we see no reason why a similar prosecutorial argument should be treated any differently when, as in this case, the trial court overrules a defense objection to the argument. The court's very act of overruling the objection put the court's imprimatur on the argument and thus tended to mislead the jury. Respondent does not contend otherwise. "*Ramos* and its rationale would indeed preclude either court or counsel from advising the jury regarding the Governor's commutation power, and the prosecutor should have avoided any argument which might have diverted the jury's attention to the question whether defendant might some day be paroled." (*People* v. *Hovey* (1988) 44 Cal.3d 543, 581 [244 Cal.Rptr. 121, 749 P.2d 776].) The same reasoning applies with equal force to references to a presidential pardon.

The first prong of our analysis in *Ramos, supra,* 37 Cal.3d 136, was that the Briggs Instruction was a misleading half-truth because it failed to inform the jury that the Governor could commute a death sentence as well as a sentence of life without opportunity for parole. (*Id.*, at pp. 153-155.) The implied suggestion of a presidential pardon was even more misleading because it was untrue. The President "shall have power to grant reprieves and pardons for offenses against the United States . . . ." (U.S. Const., art. II, § 2, cl. 1.) The President does not have the power to pardon those persons, like defendant, who are convicted only of crimes under state law. (*Young* v. *United States* (1877) 97 U.S. (7 Otto) 39, 66 [24 L.Ed. 992, 999-1000]; *In re Bocchiaro* (W.D.N.Y. 1943) 49 F.Supp. 37, 38; Tribe, American Constitutional Law (2d ed. 1988) § 4.12, p. 256, fn. 10.) Defendant's dream to the contrary is perhaps understandable in light of his plight and his status as a layman with little education. The prosecutor, however, had no excuse for misrepresenting the Constitution, whether his doing so was a matter of oversight or opportunism. The prosecutor's argument was misleading and therefore error under *Ramos, supra,* 37 Cal.3d 136, 153-155.

The argument was also error because it invited ". . . the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination." (*Ramos, supra,* 37 Cal.3d 136, 155.) The prosecutor's argument was preposterous. The prosecutor asked the jury to consider the possibility of "miracles," "earthquakes," "social revolutions," "wars," and fantastical motion picture plots. Because the argument was speculative, it was error under *Ramos.* Moreover, to the extent the argument suggested future presidential intervention on defendant's behalf, it further violated *Ramos* by tending "to diminish the jury's sense of responsibility for its action." (*Ramos, supra,* 37 Cal.3d at p.157.)

Respondent asserts three reasons why the argument was not error. None are persuasive. Respondent first contends there was no error because the prosecutor did not refer to the Governor's commutation power. *Ramos, supra*, 37 Cal.3d 136, cannot be parsed so finely as to prohibit references to gubernatorial power but to allow references to presidential power. Second, respondent asserts that the defense invited the argument by introducing the psychiatrist's testimony as to defendant's dream of a pardon. We disagree. That testimony dealt only with defendant's mental state. To that extent, it was proper for the prosecution to address the issue. Indeed, the prosecution did so, and the defense did not object. The prosecution, however, later went far beyond that limited issue, implicitly suggesting there was a possibility defendant's dream might become a reality. Respondent's third contention is that the argument was proper because it was couched in terms of defendant's future dangerousness. This is not supported by the record. Moreover, such argument, if accepted in this context, would eviscerate *Ramos* because a prosecutor could easily speculate that future events, e.g., a pardon, might result in the defendant's release and that he would then be dangerous. One of the premises of *Ramos* is that "One principal difficulty, of course, lies in attempting to predict what a particular defendant is likely to be like some 10, 15, 20 or more years in the future when commutation may be considered." (*Ramos, supra*, 37 Cal.3d at p. 156.) In short, respondent fails to persuade us that the argument was not error.

Defendant correctly notes that "*Ramos* error is *generally* reversible." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 794 [254 Cal.Rptr. 257, 765 P.2d 419], italics added; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1101-1102 [255 Cal.Rptr. 352, 767 P.2d 619].) Being generally reversible, however, is not the same as being per se reversible. In those cases in which we have reversed for *Ramos* error, the trial court has typically given an affirmative instruction as to the Governor's commutation power, and prejudice was plain. (*Ramos, supra*, 37 Cal.3d 136, 155; *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248].) In such cases, no extended discussion of prejudice was required. It is nonetheless clear that *Ramos* error is not reversible per se. We must determine whether the error was prejudicial, more specifically, whether there is a reasonable possibility the error affected the jury's penalty determination. (*People* v. *Coleman, supra*, 46 Cal.3d 749, 780-782; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 918-919 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

Respondent's entire prejudice argument is that "[T]here was very little credible mitigating evidence, if any, whereas the evidence in aggravation was simply overwhelming." Although this naked assertion is singularly unpersuasive, our independent review of the record convinces us that the error was *not* prejudicial.

We have first considered those factors that weigh in defendant's favor on the prejudice question. They are slight. Before the penalty phase arguments and instructions, an unidentified juror submitted the following handwritten note to the court: "Does life in prison without chance of parole mean exactly what it says? Is there any chance of parole? This is important to know in order to make the decision." The court informed all counsel of the note and its contents and subsequently advised the jury, "I did receive a note from one of the jurors asking a question primarily legal in nature and it is something that we'll—I don't know who wrote it but whoever wrote the note here, that will be addressed in my instructions and I'm sure by both counsel." We may assume, only for the purpose of discussion, that the prosecutor's subsequent argument as to a presidential pardon and other "miracles" may have exacerbated the concern of the juror who submitted the note.

Any nascent concern, however, was eliminated. After the prosecutor's improper argument, defense counsel correctly argued to the jury: "Let me remind you just what life in prison without the possibility of parole means. Frankly, it means just that. You've been instructed as to that. You'll be instructed again. . . . The defendant, Michael Hill, will be imprisoned for the rest of his life period." The court thereafter, at defendant's request, instructed the jury accordingly: "Life without the possibility of parole means exactly what it says, the defendant will be imprisoned for the rest of his life. . . . For you to conclude otherwise would be to rely on conjecture and speculation and would be a violation of your oath as trial jurors." Jurors are presumed to follow the court's instructions. (*People v. Hardy* (1992) 2 Cal.4th 86, 208 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Coleman, supra,* 46 Cal.3d 749, 782.) This pinpoint instruction made clear to the jury that it must reject the prosecutor's suggestion to the contrary.

We also find that the nature of the prosecutor's argument by itself assuaged any possible concern a juror might have had. Put bluntly, the argument was patently hyperbolic and incredible. His primary support was a fictionalized motion picture account of convicts fighting in World War II. It seems unlikely that any reasonable juror would have been persuaded by the prosecutor's hyperbole. The farfetched tenor of the argument likely had the unintended effect of demonstrating to the jury that there was no realistic possibility defendant would ever be released from prison if he were sentenced to life without opportunity for parole. The error under *Ramos, supra,* 37 Cal.3d 136, was not prejudicial.

B. *Prosecutor's references to religion*

■ Defendant contends at some length that the prosecutor improperly relied on biblical references in urging the jury to impose the death penalty.

Defendant concedes his trial counsel failed to object to these references, which "precludes review of this issue on direct appeal." He is correct. His objection is waived. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 335 [246 Cal.Rptr. 886, 753 P.2d 1082].) To preserve a claim of prosecutorial misconduct during the penalty phase, the defense must both object *and* request a curative jury admonition. (*Ibid.*) Defendant did neither. Moreover, defendant's concession of waiver is an understatement. Trial counsel not only failed to object, but *he* relied at length on the Bible as support for *not* imposing the death penalty.

Perhaps to avoid his waiver, defendant argues that the prosecutor's allegedly improper references ". . . illustrate the severity of the improper, irrelevant and unconstitutional arguments to which appellant's jury was subjected." (See *People* v. *Poggi, supra,* 45 Cal.3d 335.) Defendant fails to explain how the biblical references had any connection with the unidentified "unconstitutional arguments" he asserts, but his challenge to those references is set forth in the portion of his brief dealing with error under *Ramos, supra,* 37 Cal.3d 136. Perhaps the suggestion is that the biblical argument somehow exacerbated the prejudice under *Ramos.* If so, the argument fails for three reasons: (1) There is no logical nexus between the *Ramos* error and the prosecutor's biblical references. The two matters are entirely unrelated. For example, we do not see, and the jury could not have seen, any connection between the Bible and "The Dirty Dozen." (2) We have found no prejudice under *Ramos.* The biblical argument could not have exacerbated a prejudice that did not exist. (3) As defendant concedes, the challenge to the biblical argument was waived. Defendant appears to be attempting to evade the effect of his failure to object by merely casting the argument in a different light. This is not permissible. (Similarly, if defendant means to argue that the biblical references were themselves improper under *Ramos,* we reject that argument because, as he concedes, that objection is waived.) For all these reasons, we reject the contention that the allegedly improper biblical argument somehow created or increased prejudice under *Ramos.*

## II. *Automatic motion to modify death verdict*

■ At the outset of the hearing on the automatic application under Penal Code section 190.4, subdivision (e) to modify the verdict, the trial court stated that it had "read and considered the probation officer's report." Defendant contends this procedure was prejudicial error. We reject the claim for two reasons.

Defendant is correct that "the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr.

834, 786 P.2d 892]; *People v. Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) "In making that ruling the judge is limited to consideration of the evidence that was before the penalty jury." (*People v. Visciotti, supra*, 2 Cal.4th 1, 78.) The probation report, of course, was not admitted into evidence. As respondent points out, however, defendant's assertion of error fails at the threshold because he failed to object at the hearing except to challenge one specific portion of the report. (His limited objection was sustained.)

Defendant's present objection also fails on the merits. Absent a contrary indication in the record, we assume the trial court was not influenced by the report in ruling on the application. (*People v. Lewis, supra*, 50 Cal.3d 262, 267; *People v. Livaditis* (1992) 2 Cal.4th 759, 787 [9 Cal.Rptr.2d 72, 831 P.2d 29].) The record in this case shows that the trial court relied only on evidence, not the probation report. Moreover, the court carefully reviewed the evidence, including the aggravating and mitigating circumstances, and concluded, "[The] jury found that the appropriate penalty is death. This decision was based on the law and the evidence the jury received. The court independently agrees, and having weighed the aggravating and mitigating factors, the court independently finds the aggravating factors substantially outweigh the mitigating." "There was no error, and certainly no prejudice." (*People v. Livaditis, supra*, 2 Cal.4th 759, 787; *People v. Visciotti, supra*, 2 Cal.4th 1, 78.)

### III. *Allegedly disparate sentence*

Defendant contends his death sentence is "cruel and unusual" and thus prohibited by the federal Constitution because his death sentence is widely disparate to the absence of any punishment imposed on Michael McCray. (U.S. Const., 8th Amend.) Defendant's factual premise is that McCray was legally responsible for the murders as either an accomplice or coconspirator but was never charged with any crime related to the robbery and murders. At trial, the prosecutor conceded as much. We will therefore assume (but only for the purpose of discussion) the correctness of defendant's factual premise. We nevertheless reject defendant's argument that we must conduct an "intracase proportionality review."

Defendant relies primarily on *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]. As we have subsequently explained, however, *Dillon* does not mandate the type of intracase review sought by defendant. In *People v. Adcox* (1988) 47 Cal.3d 207 [253 Cal.Rptr. 55, 763 P.2d 906], the defendant contended his sentence was disproportionate to his individual culpability because two other participants in the crime received lesser sentences and because there was uncertainty as to his personal culpability. We

rejected the argument, noting that his " 'reliance on *Dillon* is wholly misplaced.' " (*People* v. *Adcox, supra,* 47 Cal.3d at p. 274.) *Dillon, supra,* 34 Cal.3d 441, does not mandate any comparison of defendant's sentence with those of other persons involved in the crime, whether they be charged or not. (*People* v. *Adcox, supra,* 47 Cal.3d 207, 274; *People* v. *McLain* (1988) 46 Cal.3d 97, 121 [249 Cal.Rptr. 630, 757 P.2d 569].)

Properly understood, intracase proportionality review is "an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others." (*People* v. *Adcox, supra,* 47 Cal.3d at p. 274, italics in original.) In this case, defendant was found to have personally committed the heinous murders of two trusting friends, including a young child, in the course of a robbery. "[N]othing in the prior decisions of this court, or of the federal courts, suggests that his punishment is constitutionally disproportionate to 'the offense' or 'the offender.' " (*Id.,* at p. 275.) The Eighth Amendment to the federal Constitution does not require us to incorporate into our proportionality determination any comparison of defendant's sentence with that of another culpable person, whether charged or uncharged. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871] [upholding California's absence of "any requirement or practice of comparative proportionality review"].) Defendant's punishment is proportionate to *his* crime. (Even if we were to consider the culpability of McCray, our conclusion would remain unchanged.)

## IV. *Alleged excessive delay on appeal*

■ Defendant argues at length that his death penalty must be set aside because the delay inherent in the capital appeal process constitutes prohibited cruel and unusual punishment. (U.S. Const., 8th Amend.) Defendant, however, does not—and in good faith cannot—allege even the slightest undue delay *by the state* in this case. Briefing was not final until December 20, 1991, and we were able to obtain defendant's reply brief only after granting numerous extensions of time to defendant's appellate counsel. The linchpin of defendant's argument therefore is necessarily that the very existence of a capital appeal renders the death penalty unconstitutional. The argument is, of course, specious. Because an appeal is constitutionally mandated, defendant's argument is in reality a frontal attack on the validity of the death penalty in all cases. The existence of an automatic appeal under state law is not a constitutional defect; it is a constitutional safeguard. (*Gregg* v. *Georgia* (1976) 428 U.S. 153, at p. 199 [49 L.Ed.2d 859, 889, 895-896, 96 S.Ct. 2909] (lead opn. of Stewart, J.) and at p. 211 (conc. opn. of White, J.).)

Defendant relies heavily on *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], in which this court held California's death

penalty system was unconstitutional under then-existing article I, section 6 of the California Constitution. Defendant is correct that *Anderson* relied in part on the inherent delay in the appeal of a capital sentence. (At pp. 649-650.) Defendant's reliance on *Anderson* is, however, unavailing for two obvious reasons. First, defendant bases his challenge only on the federal Constitution, but the *Anderson* court explicitly based its decision solely on the California Constitution. Second, *Anderson* was promptly repudiated by California voters, who amended the California Constitution to make clear that the death penalty and its related statutory scheme do not constitute cruel or unusual punishment or any other violation of the state Constitution. (Cal. Const., art. I, § 27.) The *Anderson* court's reasoning, including its reliance on appellate delay, ceased to have any force or effect when article I, section 27 became effective. We decline to find a federal constitutional violation based on the partial reasoning of a decision under state law, which decision is no longer operative.

To the extent we have previously addressed the federal claim raised here, our reasoning is contrary to defendant's position. In *People* v. *Chessman* (1959) 52 Cal.2d 467 [341 P.2d 679], we rejected the argument that confinement for more than 11 years while appealing a death sentence was "unconstitutionally cruel or unusual punishment." (*Id.,* at p. 499.)

Defendant's claim also suffers from a lack of federal support. A federal court recently rejected a defendant's contention that "fulfillment of his sentence after sixteen years on death row would constitute cruel and unusual punishment in violation of the eighth and fourteenth amendments. [Fn.] We know of no decision by either the United States Supreme Court or this circuit that has held that the accumulation of time a defendant spends on death row during the prosecution of his appeals can accrue into an independent constitutional violation . . . ." (*Richmond* v. *Lewis* (9th Cir. 1990) 921 F.2d 933, 949.) We are similarly unaware of any such authority. Indeed, the longest postconviction "delay" in most capital cases accumulates during the defendant's collateral attacks in the federal courts, and to our knowledge, those courts—which, of course, have the last word in matters of federal law—have never set aside a death sentence based on the "inherent delay" in either an appeal or collateral challenge.

Indeed, the inherent-delay argument is untenable in a capital case, like this one, in which the judgment as to the defendant's guilt and death-eligibility, i.e., a statutory special circumstance, are affirmed on appeal. Such a defendant faces only two possible outcomes as to penalty—death or life in prison without parole. If the death sentence is set aside, there is no conceivable basis on which to claim that a delay—no matter how lengthy—resulted in

prejudice to the defendant. "By common understanding imprisonment for life is a less penalty than death." (*Biddle* v. *Perovich* (1927) 274 U.S. 480, 487 [71 L.Ed. 1161, 1164, 47 S.Ct. 664, 52 A.L.R. 832].) Conversely, if the death sentence is affirmed, the delay—again, no matter how long—benefitted defendant rather than prejudiced him because the delay prolonged his life.

For all the foregoing reasons, we hold that the "inherent delay" of which defendant complains is not a basis for finding that either the death penalty itself or the process leading to it is cruel and unusual punishment.

## V. *Preservation of issues for federal appeal*

Defendant briefly sets forth seven additional issues only for the purpose of preserving them if he chooses to challenge our judgment in the federal courts. They are preserved. They are rejected.[5]

## DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., and George, J., concurred.

MOSK, J.—I concur in the judgment. After review, I agree with my colleagues that there is no error or other defect that requires reversal or vacation.

I write separately merely to note a disturbing aspect of the trial: the prosecutor's reference in summation to Bible verses assertedly "sanctioning . . . the death penalty in cases like this."

It is of course misconduct for a prosecutor to invoke purported religious law in support of the imposition of the penalty of death. Argument of this sort by a representative of the government offends California statutes and

---

[5]The issues preserved are as follows: (1) the alleged failure to delete inapplicable sentencing factors, (2) the alleged failure to designate which instructions are mitigating and which are aggravating, (3) the alleged failure to find that death was the appropriate sentence beyond a reasonable doubt, (4) the alleged failure to find that aggravation outweighed mitigation beyond a reasonable doubt, (5) the alleged failure of the trial court to instruct the jury that the sentence of life without parole means that defendant will never be considered for parole, (6) the alleged ambiguous language of the instructions regarding "criminal activity," and (7) the alleged improper use of a robbery felony count.

judicial decisions, which establish the positive, secular law of this state as the rule governing the choice between life and death (see *People* v. *Mincey* (1992) 2 Cal.4th 408, 483-484 [6 Cal.Rptr.2d 822, 827 P.2d 388] (conc. & dis. opn. of Mosk, J.)). It also violates the United States and California Constitutions—including their respective clauses concerning establishment of religion (U.S. Const., Amend. I; Cal. Const., art. I, § 4), cruel and unusual punishments (U.S. Const., Amend. VIII; Cal. Const., art. I, § 17), and due process of law (U.S. Const., Amend. XIV; Cal. Const., art. I, § 15).

The prosecutor here came perilously close to crossing the line into misconduct, but did not actually do so. For that reason, I need say no more—other than to strongly caution against such improper argument in the future.[1]

Appellant's petition for a rehearing was denied January 20, 1993.

---

[1]I note in passing that defendant has not preserved a claim of prosecutorial misconduct in this regard. That means only that he is not entitled to require that we review the point as a matter of right. It does *not* mean that we are somehow barred from undertaking such review *ex mero motu*. Plainly, albeit impliedly, the California Constitution obligates us to reverse a judgment that results from a miscarriage of justice. Any rule of less than constitutional stature that may be construed to prevent us from discharging our duty (see, e.g., Evid. Code, §§ 353, 354) is invalid to that extent. That said, there was no miscarriage of justice here.