Filed 2/29/16  P. v. Brown CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER BROWN,<br><br>    Defendant and Appellant. | G050477<br><br>(Super. Ct. No. 10HF1824)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed with directions.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lise Jacobson and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Christopher Brown of first degree residential robbery in concert (Pen. Code, §§ 211, 212.5, subd. (a) [inhabited dwelling house], (count 1); all statutory citations are to the Penal Code), battery as a hate crime (§§ 242, 422.7, subd. (a) (count 2)), witness dissuasion by force or threat (§ 136.1 (count 3)), and assault with a deadly weapon (§ 245, subd. (a)(1) (count 4)). The jury also found Brown committed each of the offenses, except robbery, for the benefit of, at the direction of, or in association with [a] criminal street gang." (§ 186.22, subd. (b).) Brown contends there is insufficient evidence to sustain the gang enhancements, the trial court erred in its instructions concerning a unanimous verdict, the prosecutor committed misconduct during rebuttal argument, and the abstract of judgment failed to reflect the trial court stayed count 4. For the reasons expressed below, we affirm with directions to correct the abstract of judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In early July 2009, Devon Decenzo was living at a Costa Mesa apartment with the primary tenant and her boyfriend. On occasion, other individuals, including Josh Lanning, stayed at the apartment, described as a heroin or drug den.

On July 8, the evening before the incident, Lanning left the apartment around 9:00 p.m. Decenzo, alone in the apartment because the primary tenants also were away, fell asleep on his futon in the living room. Sometime between 2:30 a.m. and 4:00 a.m. the following morning, Decenzo awoke to find Brown, accompanied by Jerry Smith. While Smith shined a flashlight in Decenzo's face, Brown questioned Decenzo about where to find Lanning, and when Decenzo said he did not know, Brown repeatedly accused Decenzo of lying. Brown asked who owned and lived in the residence, what Decenzo was doing there, and how he knew Lanning. During this confrontation, Brown continually referred to Decenzo as a "nigger."

2

Brown interrupted his interrogation to rummage the apartment, eventually making his way upstairs. Smith, who stayed behind to keep an eye on Decenzo, explained they wanted to find Lanning because he had stolen items from Brown's girlfriend, including a credit card, laptop, and money.

While Brown was upstairs, Smith told Decenzo he could leave, but Brown came downstairs before Decenzo could depart. Brown held a laundry basket containing personal property belonging to the primary tenants. Brown asked some more questions about Lanning, and continued to berate Decenzo with ethnic and homophobic slurs. When Brown asked Decenzo why he lived with drug users, Decenzo explained he was homeless, the others allowed him to stay provided he cleaned the house, and he intended to live there until he could get a job and go back to school. Brown responded, "Well, you're a nigger. You're not going to school. Niggers don't go to school."

During the incident Brown picked up Decenzo's black Swiss Army brand backpack that contained "the basic essentials [he] needed to survive," threw the contents around the room, and tossed the backpack to the floor.

Brown directed Smith to go outside to "get Ruby," later identified as Brent Vindhurst. Ruby entered the apartment with "lots of energy" as he confronted Decenzo, calling him a "nigger" and threatening to "fuck" Decenzo up if he looked at him, and warning Decenzo he "always wanted to hit a nigger." Ruby also asked about Lanning's whereabouts.

Ruby went upstairs and came down with an Airsoft plastic pellet gun. Decenzo told him the gun was "out of gas [CO2]," but Ruby said "it doesn't matter" and he "always wanted to pistol-whip a nigger."

After Smith stepped outside, Brown told Decenzo that since Smith left the house they no longer had to "control themselves any more." Brown explained he "shank[ed] niggers" in prison. Ruby then hit Decenzo in the head with the Airsoft gun,

3

and both men "started stomping" on Decenzo, kicking him in the side approximately 10 times while calling him a "nigger."

During Decenzo's ordeal Brown announced a second time he was from "O.C. Skinheads" and he was known as "Killer." He also referred to the gang during the stomping episode, stating, "[d]on't fuck with the O.C. Skinheads."

Before the assailants left, Brown grabbed Decenzo's wallet from the backpack and warned he had Decenzo's driver's license, knew where Decenzo and his family lived, and threatened to "fucking kill all of you" if Decenzo informed the police.

As the men departed, they directed Decenzo to tell Lanning they came by, they were looking for him, and they would kill him if they saw him in Orange County. Smith, who had come back into the house, wrote on a wall, "Josh, call me ASAP, [phone number], Big J" He told Decenzo, "[d]on't worry about telling him who was here because he already knows. You can tell him . . . to get a hold of me at this number." The men "kept telling [Decenzo] how they were O.C. Skinheads and laughing," and then departed. Decenzo also recalled telling a police officer Brown identified himself as "Evil" from O.C. Skinheads, and threatened to return every day and "fuck [Decenzo] up" unless Lanning "man[ned] up for what he did" so Brown could "kick his ass." Brown said he was "taking" Decenzo's driver's license. Decenzo thought Brown had taken his wallet and license, but he recovered them from the police about a week or two later.

Decenzo waited until he believed the men had gone, and then walked to a convenience store and called 911. Paramedics transported him to the hospital, where he received five sutures for his head wound. The area above his right hip was painful for a week after the attack.

Decenzo initially testified Brown had not taken his backpack, and acknowledged he did not tell anyone at the scene his backpack had been stolen. At the preliminary hearing, however, Decenzo testified Brown dumped his stuff on the ground and took the backpack. At trial, he explained the conflict in his testimony and his

4

confusion: "Again, it's just the time in between of everything happening. [The officers or prosecutors had given him] papers to review" and he "just picked out things [he] thought was more important than the backpack. But the reason they conflict is because [he] thought [Brown] took the wallet only that came out of the backpack. [He] forgot that [Brown] used the backpack to carry more stuff out with." Decenzo returned to the apartment the day after the attack, and did not "think" he left the house that day with his backpack. He did not currently have the backpack in his possession and, unlike his wallet, driver's license, and social security card, he did not receive his backpack from the police.

At trial, Decenzo did not specifically recall who threatened him, but explained Brown made "90 percent of the threats," including the statement "My name is Evil, and I am – I'm from O.C. Skinheads, motherfucker. We are taking your I.D. and all your shit. You give Josh [Lanning] the message. If he doesn't fucking come and man up for what he did, I'm going to kick – I'm going to take whatever I want."

Officer Rieckhof testified he interviewed Decenzo twice on the night of the attack. Decenzo told the officer Ruby and the man calling himself "Evil" claimed they were O.C. Skinheads, made numerous racial slurs, and threatened to kill him. Decenzo said Ruby took the wallet that was next to the futon, removed his driver's license, and asked Evil if they should keep it. Evil agreed, and Ruby put the items in his jacket pocket. Ruby warned Decenzo they knew who he was and threatened him if he contacted the police. Decenzo did not mention his backpack being stolen. An investigator found Decenzo's driver's license on the floor near the sofa sticking out from under a pile of clothes, but did not find a backpack in the filthy, cluttered apartment.

After his arrest, Brown initially denied any involvement in the incident. He told officers he hung out with a gang called OCS and named several of its members. He admitted his nickname was Evil, but denied knowing Smith or Ruby. He also admitted to "prospecting" for a Jesse Raffensberger at some point in the past. He knew Lanning from

5

the Nazi Lowriders gang and claimed Lanning had "ripped off a bunch . . . [of] broads." Later, Brown stated he had been outside the apartment when an assault possibly occurred inside. He gave officers an address in Huntington Beach where, about three weeks later, they located Vindhurst and Smith, and a pellet gun that had Brown's DNA on it.

Officer James Brown testified as a gang expert. He opined Orange County Skins (OCS) was a criminal street gang, the gang's primary activities included robberies and assaults with deadly weapons, and Brown was an active participant in the OCS gang on the night of the attack, as were Vindhurst and Smith. Officer Brown explained it was common for a gang member to commit crimes with other gang members because each relies on and trusts the other to achieve their criminal objective. Officer Brown also opined, based on hypothetical questions mirroring the facts of the case, the current crimes benefitted OCS because violent acts committed in the presence of others caused the gang and the perpetrators to "get notoriety, respect, more fear and intimidation to their favor" as others learned what had occurred. He also opined the crimes were "gang motivated" and "done to promote, further, or assist criminal conduct by Orange County Skins gang members."

Officer Brown testified Brown had several tattoos, including swastikas, which were emblematic of White supremacist ideology, but he did not have OCS-specific tattoos. Officer Brown described "prospecting" as similar to "pledging" a fraternity because the prospect is "trying to prove [his] bones, trying to get in . . . as a member of the organization."

Following trial in April 2014, a jury convicted Brown as noted above. In July 2014, the trial court imposed a prison sentence of life with a minimum term of seven years for witness dissuasion by force or threat on count 3, and an indeterminate life term with a seven-year minimum for threatening Decenzo. The court stayed punishment (§ 654) on the other counts and enhancements.

6

# II

## DISCUSSION

A.  *Substantial Evidence Supports the Gang Enhancements*

Section 186.22, subdivision (b), provides for an enhanced prison sentence where a person is convicted of certain felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, [and] with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." Where the offense is witness dissuasion by force or threat (§ 136.1, subd. (c)(1)), section 186.22 specifies the punishment is an indeterminate life term with a seven-year minimum (§ 186.22, subd. (b)(4)(C)). The jury found all of the charged offenses except robbery qualified for the gang enhancement. Brown challenges the sufficiency of the evidence to support the enhancement.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) Consequently, a defendant "bears an enormous burden" when challenging the sufficiency of the evidence. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

Brown contends Officer Brown's opinions did not alone or in combination with the other evidence constitute substantial evidence the crimes benefitted OCS, or that

7

Brown intended to benefit OCS. Brown faults Officer Brown's testimony in several respects. In answering a hypothetical based on the facts of the current case Officer Brown testified the crimes would benefit OCS because they garnered fear, respect, and notoriety for the gang. The officer stated his opinion would not change even if the perpetrators had not identified themselves as OCS gang members during the attack. Brown argues "Officer Brown's response to the altered hypothetical demonstrates his opinion as to benefit to the gang was simply pulled out of the air." Brown also faults the officer's opinion Vindhurst and Smith were actively participating in OCS even though he admitted there was no evidence to support his conclusion other than their participation in the current crimes.

We do not find Brown's arguments persuasive. Brown admitted to Officer Brown he associated with OCS and named several of its members, and had participated in "prospecting" a new member with the gang. He also identified himself during or just after the attack as "Evil" from O.C. Skinheads. The jury reasonably could conclude Smith and Vindhurst also associated with OCS based on Officer Brown's explanation gang members often act together in committing crimes because they can rely on and trust each other, and here both Smith and Vindhurst cooperated and supported Brown during this racially-motivated attack. It also was apparent both held White supremacist views because both identified themselves as OCS members as they departed the apartment. Substantial evidence therefore exists to sustain the jury's finding the felonies were committed in association with the OCS criminal street gang.

The jury also could find the crimes were committed to benefit OCS. As Officer Brown explained, a violent racially-motivated attack by known OCS members and associates tended to cause the gang and its perpetrators to gain "notoriety, respect, more fear and intimidation to their favor . . . ." The jury could find the assaultive crimes benefitted OCS because a violent assault conveyed a message that if Lanning or Decenzo, for example, trifled with OCS, the gang would retaliate with extreme force.

8

It is also apparent the jury could infer Brown acted with "the specific intent to promote, further, or assist in *any* criminal conduct by gang members . . . ." The intent requirement "is the specific intent to promote, further, or assist in *any* criminal conduct by gang members – including the current offenses – and not merely *other* criminal conduct by gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 65.) Where "substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 [committing crime in concert with known gang members constitutes substantial evidence the defendant acted with the specific intent to promote, further or assist gang members in the commission of crime].)

Here, the jury drew the reasonable inference that Brown, Vindhurst and Smith were members of the OCS gang based on their association, conduct, and statements on the night of the attack. Decenzo testified Brown stated he was from O.C. Skinheads and they called him "Killer." Brown also referred to the gang during the stomping episode with Ruby, stating, "[d]on't fuck with the O.C. Skinheads." Decenzo testified the men "kept telling [Decenzo] how they were O.C. Skinheads and laughing . . . ." Decenzo told Officer Rieckhof Ruby warned Decenzo they were O.C. Skinheads and threatened they would kill him. None of the attackers objected or denied the truth of Brown's or Vindhurst's pronouncements they were from O.C. Skinheads. Brown admitted to officers he associated with a gang called OCS and named several members. He acknowledged his nickname was "Evil," and also admitted to "prospecting" (pledging) for a known OCS member Jesse Raffensberger in the past. The jury therefore reasonably could infer Brown had the specific intent to promote, further, or assist criminal conduct – the instant offenses – by OCS gang members.

9

B.  *Unanimity Instruction – CALCRIM No. 3501*

During a recorded discussion concerning jury instructions, the trial court noted the parties and court informally had discussed proposed instructions and the parties agreed on most of them.  The prosecution and defense also agreed to a procedure that failure to object to a proposed instruction would be deemed consent to that instruction.  Neither party objected when the trial court stated it would instruct the jury on unanimity using CALCRIM No. 3501.  Later, during a break in reading jury instructions, the court advised the prosecutor it was not giving CALCRIM No. 3500 and "we decided to give 3501 instead."  The prosecutor stated he was withdrawing CALCRIM No. 3500, and defense counsel stated he agreed with the withdrawal.

The court later instructed the jury with CALCRIM No. 3501 as follows: "The defendant is charged with 1st degree robbery in concert in Count 1, battery – hate crime with present ability to commit violent injury or causing injury in Count 2, dissuading a witness by force or threat in Count 3, and assault with a deadly weapon in Count 4 during a period of time on July 9, 2009.  [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses.  You must not find the defendant guilty unless:  [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR [¶] *2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged.*" (Italics added.)

Brown contends the trial court erred by giving the italicized portion of CALCRIM No. 3501 because it applies only to "generic evidence."  Because Brown concludes there was no generic evidence in this case, he reasons the instruction encouraged jurors to gloss over details and merge the criminal acts to resolve the charges, thereby lowering the prosecution's burden of proof.

10

The Attorney General contends Brown's lawyer invited the error, and Brown forfeited the claim because his trial counsel failed to seek modification or clarification of the instruction. She also contends a unanimity instruction was not required, CALCRIM No. 3501 did not encourage the jury to forego particularized analysis of the facts of each purported violation, and any error was not prejudicial.

1. Invited Error

"When a defense attorney makes a 'conscious, deliberate tactical choice' to forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was omitted in error." (*People v. Wader* (1993) 5 Cal.4th 610, 657-658.) "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal." (*People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201.) "Error is invited only if defense counsel affirmatively causes the error and makes 'clear that [he] acted for tactical reasons and not out of ignorance or mistake' or forgetfulness." (*People v. Lara* (2001) 86 Cal.App.4th 139, 165.)

The record does not reflect trial counsel caused any error concerning the unanimity instruction, nor did he make clear he was acting clearly for tactical reasons and not out of ignorance, mistake or forgetfulness. The invited error doctrine does not apply.

2. Forfeiture

The Attorney General also contends Brown forfeited his claim of instructional error because he failed to request appropriate clarifying or amplifying language. (*People v. Hill* (1992) 3 Cal.4th 959, 997, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192 ["Defendant claims that above italicized words rendered the instruction vague, misleading and constitutionally defective. However, if defendant

11

believed the instruction was unclear, he had the obligation to request clarifying language"].)  The Attorney General's claim is meritless.

Section 1259 provides, "The appellate court may [] review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."  Brown contends his substantial rights were affected because the instruction lowered the prosecution's burden of proof.  An instruction that lowers the prosecution's burden of proof affects a defendant's substantial rights.  (*People v. Johnson* (2004) 119 Cal.App.4th 976, 985.)  Accordingly, we address the merits.

3.  Brown Was Not Prejudiced by CALCRIM No. 3501

California law provides that the jury verdict in a criminal case must be unanimous.  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; see Cal. Const., art. I, § 16.)  Instructing the jury on the unanimity requirement "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'"  (*Russo,* at p. 1132.)  Put another way, the instruction "'is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'"  (*Ibid.*)

Brown argues a unanimity instruction was required because the prosecution presented evidence of more than one act to prove the robbery (count 1) and witness dissuasion (count 3) offenses.  Concerning the robbery, he contends the prosecutor argued, and the jury could have found, Brown committed robbery by taking either Decenzo's backpack or his driver's license, and asserts different potential defenses existed as to those acts.  The defense, citing Decenzo's conflicting accounts, questioned whether the backpack had been taken at all.  As for the driver's license, the jury could have found Brown lacked the intent to permanently deprive Decenzo of his license

12

because the police found it in the apartment.[1]  Concerning witness dissuasion, Brown argues the jury may have relied on several statements and threats Brown or Ruby made during the incident.  Brown argued at trial the prosecution had not proven who made the threats, Brown lacked the specific intent required of an aider and abettor to hold him responsible for Ruby's threats, and the crimes against Decenzo were not the natural and probable consequence of a conspiracy to assault Lanning.

Brown concedes the jury was given a specific acts unanimity instruction, which was contained in paragraph 1 of CALCRIM No. 3501.  But he complains the italicized portion, paragraph 2, of the instruction is appropriate only for cases with "generic evidence."  (See *People v. Jones* (1990) 51 Cal.3d 294 [witness testifies to numerous, repeated acts over a period of time but is unable to provide specifics on time and date].)  Because there was no generic evidence in this case, Brown argues, "The jury was given no guidance as to when to apply each of the options described in CALCRIM No. 3501.  There was nothing to prevent the jury from treating the evidence of specific acts as 'generic' evidence."  Thus, Brown asserts the instructional error lowered "the prosecution's burden of proof by allowing the jury to consider evidence of specific acts in the aggregate, and to convict appellant of the charges in counts 1 [robbery] and 3 [witness dissuasion] without particularized consideration of each alleged instance of conduct and the defenses applicable thereto."

Because there was no generic evidence in this case, CALCRIM No. 3500 was the appropriate instruction for use in this case, not CALCRIM No. 3501.  In evaluating Brown's claim, we must determine whether there is a reasonable likelihood

---

[1]     Neither side argued Brown could be guilty of robbery for taking the roommates' property.  The prosecutor did not argue Decenzo constructively possessed this property.  Defense counsel suggested Brown could be guilty of the "lesser included offense of theft" for taking their property, but theft of property in another's possession would not be a lesser included offense of robbery of the named victim.

the jury understood the instruction in a manner that violated Brown's rights. (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) Here, there is no reasonable likelihood the jury would have understood the instruction to allow it to convict Brown of robbery and witness dissuasion without agreeing either he committed a specific act supportive of each offense, or that he committed "all the acts." We disagree the instruction allowed the jury to amalgamate evidence of multiple offenses to conclude beyond a reasonable doubt he committed each charged offense. The trial court's instruction informed the jury of the requirement it must unanimously agree Brown committed each specific act or unanimously agree he committed all of the criminal acts, which imposes a heavier burden than requiring unanimous agreement on any particular act. (*People v. Baughman* (2008) 166 Cal.App.4th 1316, 1321.) Reasonable jurors tracking this instruction would have concluded, based on the evidence and counsel's arguments, the only acts constituting robbery were the taking of Decenzo's backpack or the driver's license, and either unanimously found he stole one of the items or both items.

Concerning the witness dissuasion charge, assuming unanimity was required (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882-883 [dissuading a witness is a "course of conduct" crime and no unanimity instruction required]), the prosecution relied on the evidence that, after removing Decenzo's driver's license from his wallet, either Brown or Ruby warned Decenzo they knew where he lived and threatened to kill Decenzo and his family if he reported the incident to the police.[2] The jury would not have convicted Brown unless jurors agreed that threat occurred. Jurors did not need to unanimously agree whether Brown uttered the threat himself as a direct perpetrator, or was liable for Ruby's threat as an aider and abettor or conspirator. (See *People v. Culuko*

_____

[2]     Section 136.1, subdivision (c)(1), prohibits knowingly and maliciously attempting to prevent or dissuade another person who has been the victim of, or witness to, a crime from making a report to a peace officer where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person.

14

(2000) 78 Cal.App.4th 307, 323.)  But even if jurors might have relied on another statement ("Don't fuck with the O.C. Skinheads") as the act triggering the section 136.1 violation, the jury was instructed it could not find Brown guilty unless it unanimously agreed he committed a specific act or "all the acts."

Brown relies primarily on *People v. Smith* (2005) 132 Cal.App.4th 1537. There, the prosecution charged the defendant with multiple counts of lewd acts on a child under age 14.  The victim described at trial three distinctly different types of molestation occurring in different locations of the defendant's residence and not necessarily on the same days, and the victim's pretrial statements singled out two specific occasions when she was molested.  The jury convicted him of only one count, acquitting him of seven counts and deadlocking on another charge.  The appellate court held the trial court erred by refusing the defendant's request for a specific acts unanimity instruction.  The court stated the instruction the court provided (a modified version of CALJIC No. 4.71.5)[3] did not comply with *Jones, supra,* 51 Cal.3d at pp. 321-322, because *Jones* specified the modified unanimity (generic acts) instruction is to be given *in addition* to a specific acts unanimity instruction.  (*Smith*, *supra*, 132 Cal.App.4th at p. 1544.)  *Smith* observed the jury might disagree on which particular act constituted the crime because the evidence presented distinct and separate episodes of molestation which occurred in different

---

[3]       "'In this case the prosecution has presented testimony that the defendant committed more than 10 essentially indistinguishable acts of fondling of the alleged victim's vagina and breasts and oral copulation of the alleged victim's vagina and one act of oral copulation of her breasts.  [¶] In order to find the defendant guilty, the jury must unanimously agree that the prosecution proved beyond a reasonable doubt that the defendant *committed all the acts described by the alleged victim* within the period alleged.  [¶] In other words, the jury must unanimously agree the alleged victim described with sufficient certainty acts which satisfy the elements of Penal Code section 288, [subdivision] (a), that the number of acts was sufficient to support each of the counts alleged and that the acts were within the general period alleged.'"  (*Smith*, *supra*, 132 Cal.App.4th at p. 1543.)

15

locations. (*Smith*, *supra*, 132 Cal.App.4th at p. 1544.) The appellate court held the error was not harmless beyond a reasonable doubt because the verdict reflected the jury returned a guilty verdict on only one count, and did not unanimously agree the prosecution proved beyond a reasonable doubt the defendant committed all the acts described by the alleged victim. The court noted it was possible the jury concluded that so "long as each juror believed beyond a reasonable doubt that [the] defendant had molested" the girl "at least once, it did not matter that they differed on what act of molestation actually occurred." (*Smith*, *supra*, 132 Cal.App.4th at p. 1546.)

Here, unlike *Smith*, only one count of each offense was charged and found true. The jury was told it could not find Brown guilty of the charged offenses unless it unanimously agreed he committed at least one of the acts presented by the evidence, or unanimously agreed he committed all of the acts presented by the evidence. And unlike *Smith*, there is nothing in the record to suggest the jury did not follow this instruction. Although this was not the type of case to instruct with CALCRIM No. 3501's second paragraph, Brown did not suffer prejudice because of this instruction.

C.  *The Prosecutor Did Not Commit Misconduct*

During his initial closing argument, the prosecutor stated, "[i]n count 1, it's a charge of robbery because they took Mr. Decenzo's backpack and [his] license." The prosecutor discussed the elements of the offense and cited the evidence demonstrating the theft of both items, arguing even though the men discarded Decenzo's license, they intended to deprive Decenzo of it at the time of the taking. In explaining the verdict forms, the prosecutor explained the meaning of lesser included offense: "It wasn't read to you on the information . . . . A lesser included offense is something that is less than what is charged. . . . In this case the lesser included of robbery is theft because all robbery is [] theft, with the additional element of force or fear. So if you folks found, well, he committed theft but he didn't use force or fear, then the lesser included offense would apply."

16

During the defense closing argument, defense counsel argued "to be guilty of robbery, you have to take something that belongs to the victim, that's in the victim's possession." Counsel argued the backpack was "absolutely critical to a finding that there was a robbery" because the roommates' property was not in Decenzo's possession, and there was reasonable doubt whether the men stole the backpack. Counsel argued Brown was guilty of the "lesser offense" of theft because they stole the roommates' property from upstairs.

In rebuttal argument, the prosecutor emphasized Decenzo's backpack and his driver's license were the only items taken in the charged robbery, explaining, "[I]f you do not believe that Mr. Brown participated in the taking of those two items, find him not guilty of robbery, one or the other. The book bag [backpack], because that was Mr. Decenzo's property and it was not there when the police were looking at it, and the driver's license." The prosecutor further explained "if you feel that that is not a robbery, then you must find him not guilty. It's not even a lesser included. It's not even a theft because I'm not talking about all the other stuff that they took that night. [¶] That's not what is being charged here and before you folks. What is before you folks is whether that robbery took place. And that theft, that lesser included, it's only applicable if you think he took that license or that book bag [backpack] but didn't do it by force or any other element in the robbery that may have been met. But that is the only two items that are being charged and are before your consideration."

Defense counsel did not object during the prosecutor's argument. After the prosecutor concluded his rebuttal argument, defense counsel complained to the court the prosecutor had raised a new legal theory during rebuttal that Brown could "only be convicted of robbery or nothing, not larceny" and the "all-or-nothing position [was] . . . extremely detrimental to" Brown. Counsel argued the jury could find Brown guilty of robbery based on Decenzo's constructive possession of the roommate's property, and

17

larceny based on the theft of that property. Counsel claimed this was an impermissible "last-minute election" by the prosecutor during rebuttal.

The prosecutor stated his theory of the case had never changed, and the robbery charge did not apply to the theft of the roommates' property located upstairs. He noted Decenzo did not feel he had any responsibility for the roommates' property, which Decenzo felt was abandoned, and the prosecutor believed it would have been improper to rely on that act of taking to support the robbery charge. The court stated even if the prosecutor might have argued constructive possession (see CALCRIM No. 1600), he elected not to and this "actually benefitted the defendant." The court concluded the prosecutor's argument did not prejudice the defense, and further instruction was unwarranted.

Brown now argues the prosecutor committed misconduct by telling the jury the robbery was based on the forcible taking of the backpack and the driver's license, and if the jury did not find that he "participated in the taking of those two items, find him not guilty of robbery . . . ." Brown asserts this misstated the law because the jury was "duty-bound to consider all of the evidence adduced in reaching its verdicts" (see CALCRIM No. 220) and the jury was entitled to convict Brown of theft as a lesser included crime (CALCRIM No. 1800) based on his taking of property other than the backpack and driver's license. (See *People v. Breverman* (1998) 19 Cal.4th 142, 154 [trial court has sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of a lesser offense; rule seeks to ensure jury will consider the full range of possible verdicts included in the charge regardless of the parties' wishes or tactics, and prevents presenting the jury with an unwarranted all-or-nothing choice].)

18

We discern no misconduct.[4] The prosecutor's theory of the case never changed. As the prosecutor explained in his opening and rebuttal arguments, the robbery charge did not encompass the taking of the upstairs property. As the trial court remarked, even if the prosecutor might have argued constructive possession of the upstairs property to support the robbery charge (see CALCRIM No. 1600), he elected not to and this "actually benefitted the defendant." In any event, nothing prevented the jury from considering whether Brown was guilty of a lesser theft offense based on the taking of the upstairs property. The jury was instructed on both robbery and theft (CALCRIM Nos. 1600, 1602, 1603, 1800, 1863 [claim of right]), told to consider all of the evidence in reaching its verdicts (CALCRIM No. 220), and also told nothing the attorneys said was evidence (CALCRIM Nos. 104, 222), and that it must follow the law as explained by the court and if it "believ[ed] that the attorneys' comments on the law conflict[ed] with [the] instructions, [it] must follow [the] instructions." (CALCRIM No. 200.)

D. *Abstract of Judgment*

The trial court imposed a three year term for assault with a deadly weapon (count 4) and stayed the term pursuant to section 654. The abstract of judgment does not reflect the stay. The parties agree we must direct the trial court to make the necessary correction.

---

[4] The Attorney General responds Brown forfeited his present claim of prosecutorial misconduct because he did not object on the same ground in the trial court. (*People v. Brown* (2003) 31 Cal.4th 518, 553; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) As noted, the arguments are not identical, but do share a common claim, namely the prosecution improperly told jury they had an "all-or-nothing" choice of robbery or acquittal based on selected evidence. (*Samayoa, supra,* 15 Cal.4th at p. 846.) In any event, we elect to "consider the issue on its merits despite a lack of objection, in order to forestall a possible claim of ineffectiveness of counsel based on failure to object." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 693.)

### III

#### DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment to reflect the term imposed for assault with a deadly weapon (count 4) is stayed (§ 654), and to forward a certified copy to the Department of Corrections and Rehabilitation.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

20